CHARLES P. STRATTON, receiver of the Camden Iron Manufacturing Company, vs. JOHN H. DIALOGUE.

1. Where real estate is *in fact* paid for with the funds of a company, there is clearly a *resulting trust* in favor of the company, although the deed therefor is made absolute to a third party, and purports upon its face to be for his own use and benefit.

2. A party so taking the title, becomes a *trustee* for the creditors and stockholders, and the trust will be enforced for their benefit at the instance of the receiver.

---

*J. Wilson* and *Carpenter*, for receiver.

Where one buys land in favor of another there is a resulting trust. 2 *Story's Eq.*, § 1201.

Specific performance is not called for, but merely execution of *trust*.

*Beasley*, for defendant, cited 1 *Lead. Cas. in Eq.* 274; *Lloyd* v. *Spillet*, 2 *Atk.* 150; *Smith* v. *Burnham*, 3 *Sumn.* 462; 2 *Sugden on Vendors* (7th *Am. ed.*) 396; *Gilbert* v. *Trustees of East Newark*, 1 *Beas.* 180; *Morgan's heirs* v. *Morgan*, 2 *Wheat.* 290; *Fry on Spec. Perf.*, § 608; 7 *Cowen*

551; *Angell & Ames on Corp.*, § 150; *Fry on Spec. Perf.*, § 314; *Trenton Mutual Life and Fire Ins. Co.* v. *McKelway*, 1 *Beas.* 133.

THE CHANCELLOR. The bill charges that while the Camden Iron Manufacturing Company were in operation in the year 1858, Henry Allen conveyed to John H. Dialogue, the defendant, sundry lots of land and real estate in the city of Camden, in trust for the company. That Dialogue claims title to the land as his own, and refuses to convey the land to the receiver or account for its value. That he has aliened a part of the land, and has exchanged portions of it with Charles Kaighn for other lands conveyed to him by Kaighn. The bill prays a discovery, an account of the moneys received for the sale of the land and for the rents and profits thereof, a discovery of the portion of the lands still held by the defendant, and a conveyance thereof to the complainant for the benefit of the creditors and stockholders of the company.

The answer admits the conveyance of the lands from Allen to the defendant, but alleges that it was in pursuance of a private contract between Allen and Dialogue, that it was not paid for by the company, nor held in trust for them.

The material question in the case is, whether the land was in fact paid for with the funds of the company. If it was, there is clearly a *resulting trust* in favor of the company, although the deed is made absolute to Dialogue, and purports upon its face to be for his own use and benefit. One of the deeds from Allen bears date on the sixteenth of April, and the other two on the twenty-second of May, eighteen hundred and fifty-eight. Cotemporaneously with the delivery of the title, there was received by Allen as a consideration for the conveyances, scrip for one hundred and forty-seven shares of the capital stock of the company, representing at its par value of $100 per share, $14,700. This scrip, as appears upon the stock book of the company and upon the face of the scrip itself, was an original issue of stock directly

from the company to Allen, the grantor. Allen testifies that he was originally applied to by the president of the company to take stock. That he offered real estate in payment, a statement of which he furnished to be laid before the board, and he was afterwards informed that his offer was accepted. The offer was made in the name of the company. In all his negotiations he understood that he was dealing with the officers for the benefit of the company. His negotiations were with two of the directors, by whom, it is evident, the affairs of the company were exclusively managed, and who owned the great mass of the stock. He understood that he was receiving the stock from the company, not the stock of an individual; and he never heard it intimated that the land was claimed by Dialogue, until shortly before the company ceased operations. Charles Kaighn, who was a director and secretary of the company at the date of the transfer, testifies that the expediency of taking the houses and lots of Allen, in exchange for stock, was discussed. by the directors. It was acquiesced in, as putting it in the power of the company to erect their works. It was understood that they could trade off the houses and lots to those who would do the work. They found it impossible to raise money to go on with the works. Easby and Dialogue both said we could get the works erected by trade in real estate, when parties would not take stock of the company in trade. One of the reasons assigned by Allen, why the deed was made to Dialogue, was that he was superintendent of the company's works, and could therefore more readily dispose of the lots in exchange for the labor of the workmen. Kaighn further testifies that the board agreed to take the property of Allen. "We congratulated each other in having a man of Allen's means in the board. As to Allen's taking Dialogue's stock, I never understood that at all. I understood that the exchange of land afterwards made by me with Dialogue for a part of these lots, and the conveyances I made to Dialogue, was for the benefit of the company. This matter of exchange was discussed between Easby, Dialogue and myself, who were then

the only directors. I was secretary when the certificates of the stock of the company was issued to Henry Allen. I did not at that time know of other stock being surrendered up and cancelled. I supposed it to be an issue of new stock." The real estate was professedly dealt with by Allen as the property of the company. This appears both by his answer, and by the evidence. Franklin Eyre, who built a wharf for the company, testifies that Dialogue, as president of the company, and with whom he contracted, offered to pay him for the work in real estate. " He showed me," the witness says, " the lots, represented to me that the company got them of Allen, told me what the company paid Allen for it. To the best of my recollection, he said the company had paid Allen $15,000 of stock. I am not certain as to the amount of the stock. I am pretty clear that Dialogue told me they had given Allen stock for the company." Easby himself, the president of the company, and the witness relied upon to support the averment of the answer, that Dialogue paid for the land with his own stock, testifies, that it was his understanding that Dialogue was to hold the property in trust for the company.

In support of the allegation that the stock issued to Allen was a re-issue of Dialogue's stock, four certificates of stock are exhibited; amounting together to 150 shares, which purport to have been issued to Dialogue on the eighth of July, 1856. These certificates are marked cancelled. Attached to them is a letter of attorney in blank, executed by Dialogue, authorizing the attorney to sell, assign and transfer unto Henry Allen, or any other person or persons, 147 shares in the capital stock of the company.

The answer to this evidence is, that the by-laws of the company require that transfers of stock shall be made upon the books of the company, in person, or by power of attorney, in presence of the president or secretary. No such transfer was ever made. The secretary swears that he never heard of any transfer of stock by Dialogue. There is no pretence that these certificates of Dialogue's were ever surrendered to the

company. When they were cancelled does not appear. There is no evidence when the letter of attorney was executed, or that it was ever delivered to Allen. The evidence is express, that it was not delivered; that he never saw, or heard of it. How then can it be evidence of a transfer of stock? The whole transaction bears upon its face the strongest evidence of having been fraudulently manufactured. At any rate it is no evidence whatever of any transfer of stock.

There is written in the stock book, in the margin of the original certificates issued to Dialogue, the words, "transferred to Henry Allen, and certificate issued," without date or signature. Easby testifies that it was made by him at the time the stock was transferred to Allen, and that it was Dialogue's stock that was transferred. As has been said already, there was no transfer of Dialogue's stock, and this evidence is directly in the face of the evidence in the cause. There is no intimation of any such transaction upon the minutes of the company, or upon the face of the stock book, except what is furnished by Easby himself. The value of this evidence will be best understood by adverting briefly to the history of the company, and the attitude of Easby and Dialogue in regard to it.

The company was incorporated on the seventh of February, 1854, with a capital of $100,000, divided into shares of $100 each. In the year 1854, an attempt was made to organize the company by the corporators named in the charter. Subscription books were opened, subscriptions obtained, and a board of directors elected. It does not appear that one dollar was paid upon the subscriptions thus made. The evidence is, that there was not. We have the history of the organization of the company from the minutes, and from the lips of Easby himself. Before the company was formed, Easby and Dialogue had been in business together under the firm of Easby & Dialogue, carrying on machine business, manufacturing steam engines, boilers, &c. None of the stock was sold for cash. Both Dialogue and Easby paid for their stock in land and materials, under the provisions of the charter.

The mode in which it was done, and the amount paid, appears from the minutes of a meeting of the directors held on the sixteenth of July, 1855. There were five directors, one of whom appears never to have acted. Three were present at the meeting, William Easby, John H. Dialogue and P. C. Brinck. Brinck purports, upon the books of the company, to have subsequently held one share of stock. At the date of the meeting, it does not appear that he had any interest whatever in the company. The following proceedings of that meeting are recorded:

" A schedule of property, consisting of machinery, tools, fixtures, stock, engines, boilers, patent right for Babbett metal, &c.; also, good will of the business of Easby & Dialogue as per inventory, amounting to $54,000, was presented to the board, and accepted as stock, materials, property, &c.," as per section nine of the charter of the company. Also, the lot of ground and buildings situate southwest corner of Second street and Stevens street, city of Camden, N. J., at a valuation of $16,000, was also accepted. The above amounts, say $54,000 and $16,000, were in payment for subscriptions to the capital stock of this, the Camden Iron Manufacturing Company.

The secretary was directed to have the deed for the above named real estate, conveyed by William Easby and wife, recorded; also, to have an affidavit by two or more directors made and filed with the secretary of state, in accordance with section third of the charter, which requires that whenever $100,000 shall have been subscribed and at least $50,-000 paid in, and an affidavit thereof made by two directors, and filed in the office of secretary of state, it shall be lawful for the said corporation to commence and carry on its business under the provisions of the act.

At this time it is clear that Easby and Dialogue were the sole owners of the concern. They simply turned over their land, machinery, patent right, and good will of the business to the company, at a valuation accepted by themselves, and remained, as before, the owners of the concern. As yet no certificate of stock appears to have been issued.

In the year 1856, Charles Kaighn's property at Kaighn's Point was purchased, and he became a stockholder and director. The mode in which he became a stockholder is worth noting, as it may tend to throw light upon the transaction with Allen. On the third of March, 1856, at a meeting of the directors, at which three were present, of whom Easby and Dialogue were two, the president, Easby, reported that he could purchase the Kaighn's Point property for $10,500; $8000 in cash, and $2500 in the stock of the company at par. On motion of Dialogue, the report was referred to the stockholders for action. At a special meeting of the stockholders, held on the thirtieth of April, the president, Easby, reported that the property could be purchased for $2000 in cash and $6000 in the stock of the company, provided the company put improvements on it to the value of $10,000 within three years; when, on motion of Dialogue, it was resolved that the report of the president be accepted, and that he be authorized to conclude the purchase upon the terms stated in the report, and have the deed made and executed to the Camden Iron Manufacturing Company forthwith. On the next day, the first of May, certificates for sixty shares of stock, which at par would be equal to $6000, were issued to, and received by Kaighn. But no deed appears to have been executed in pursuance of the instructions of the stockholders. Easby appears to have taken the title to himself. At a meeting of the directors on the third of April, 1858, at which were present Easby, Dialogue and Kaighn, it was resolved that William Easby be requested to state upon what terms he will convey to the company the property at Kaighn's Point. At a meeting on the twenty-second of May, the same three directors being present, it was resolved that "a special meeting of the stockholders be called to take into consideration the purchase of the wharf property at Kaighn's Point, and the erection of the works thereon." On the first of June, 1858, the stockholders meeting was held, to take into consideration the purchase of the Kaighn's Point property. Kaighn, Dialogue and Easby were present.

Kaighn was president, Dialogue secretary, and we know that Easby was present, for the minutes gravely state that stockholders were present, representing 600 shares of stock. Easby, at that time, we know, held over 500 shares of the stock, and must therefore have been one.

It was resolved that the board of directors be authorized and empowered to purchase of William Easby, the wharf and property at Kaighn's Point, formerly belonging to Charles Kaighn, upon such terms as may be deemed by them for the best interests of the company. On the fifth of June, Easby presented his resignation as president and director. Dialogue was elected president, and Allen, a director in his place. At a meeting of the directors on the tenth of June, the president (Dialogue) produced to the board the unexecuted deed of Easby to the company for the property at Kaighn's Point, also the bond and mortgage proposed to be given to Easby, to secure $20,000 *of the purchase money* thereof, as proposed, for execution and delivery : when, on motion, it was resolved that the president and secretary be authorized to accept said deed, when executed, and to execute and deliver said bond and mortgage. This is the same property which Easby was instructed to have conveyed directly from Kaighn to the company for $8000, and for which, on the first of May, 1856, stock of the company to the amount of $6000 was issued to Kaighn, so that the property stood the company in $26,000.

It may be suggested that the conduct of Easby or of Dialogue, as directors, is not in issue, and that the facts alluded to may admit of denial or explanation. That is conceded. But these facts appear upon the face of the evidence, and they are material as showing by whom the stock of the company was owned, how, and for what purposes it was held and transferred. They are material moreover, as directly confirmatory of other evidence in the cause. They show that Easby and Dialogue were partners in the iron manufacturing business, when the charter of this iron manufacturing company was obtained. That they turned over to the company at a valuation of $70,000, all their land, machinery and other

G *

partnership property, including patent rights and the good will of their business, in payment for subscriptions to the capital stock of the company. That they continued in the control of the company from that hour until after the transfer of stock to Allen. That no stock was issued to any one until May first, 1856, after the purchase of the Kaighn's Point property, when 60 shares were issued to Charles Kaighn. On the twentieth of December, 1856, forty additional shares were issued to Kaighn. There were also issued during the same period, between the first of May and the thirty-first of December, 1856, 500 shares, just one half of the whole stock, to Easby, and 220 shares to Dialogue. So that on the thirty-first of December, 1856, there had been issued to Easby and Dialogue, the original proprietors of the property, 720 shares, which was twenty shares more than they paid for by the transfer of their property, and 100 shares to Kaighn in the purchase of his land. There were also certificates for 50 shares of stock issued to Easby on the thirty-first of December, 1856, which are stated, under Easby's receipt, to have been a dividend declared by the company for 1855. I do not find that any such dividend was declared. It does not, I think, appear upon the minutes of the directors. Easby, however, says it was made and recorded in the book of the company. It was a ten per cent. dividend. It was supposed at the time, that that dividend was made out of the profits of the company's business during that time, but it was afterwards discovered not to be so. It was a mistake of the secretary. Laying, therefore, this certificate out of the question, there were but 800 shares properly issued, when Allen conveyed his land to the company. The issue of the stock to Allen was not, therefore, an over issue of stock, but was stock belonging to the company as such, which had never been issued, and which was lawfully issued to Allen by the company.

So far as appears by the evidence, there has not been a share of this stock purchased and paid for after the organization of the company, except by Kaighn in 1856, and by Allen in

1858. They both received their stock directly from and in the name of the company. They both transferred their land for the benefit of the company. And yet, upon some pretext, the whole of Kaighn's land passes into the hands of Easby, one of the copartners in the original concern, and the president of the company; and the whole land conveyed by Allen passes into the hands of Dialogue, the other copartner, also a director of the company. The evidence shows, unequivocally, in the case of Dialogue, that the land was purchased with the funds of the company, and that he holds it in trust for the creditors and stockholders of the corporation. It will be decreed accordingly.

I think there is nothing in the objection that the company could not take the land in payment for the stock of the company. Clearly, the land having been paid for by the funds of the company and conveyed to Dialogue, he becomes a trustee for the creditors and stockholders. The trust will be enforced for their benefit.