WHEELER and GREEN *vs.* GEORGE KIRTLAND and others.

WHEELER and GREEN *vs.* JOHN KIRTLAND and others.

G. W. KIRTLAND *vs.* JOHN KIRTLAND and others.

1. If a man, when insolvent or in debt, advances money as a gift to his wife or her father, they being at the time ignorant of the indebtedness or insolvency, and the donee receives the money in good faith, supposing that the donor was perfectly solvent and that the gift could not injure his creditors, present or future, and was not intended for such purpose, and purchases property or enters into business with the money, but afterwards, upon learning of the embarrassment of the donor, pays him back in full the amount received, there is no fraud in such transaction, or any other ground to infer or create a trust for future, or even existing creditors, in the property purchased and its advance, or in the profits of the business, after the money is returned, or even while it is kept in good faith.

2. A trust is held to result by operation of law, where one purchases land with his own money and takes the conveyance in the name of another; in such case the title is deemed to be in trust for him who advanced the money.

Wheeler and Green *v.* Kirtland.

3. If one purchases land, and takes the title in the name of his wife or child, it will be held to be a settlement on the wife or an advancement to the child, unless it is shown to have been otherwise intended, and no trust will result. But in such case, if the purchaser takes the deed in the name of his wife or child for the purpose of defrauding or delaying creditors, and not for the purpose of making a settlement or advancement, a trust will result to the purchaser, and the land be liable to his debts.

4. When the person to whom the conveyance is made makes the bargain for the purchase for his own benefit, and obtains part, or even the whole of the purchase money from another, who knows that it is to be paid for a conveyance to the grantee for his own benefit, no resulting trust can arise.

5. Where a wife purchases real estate for her own benefit, and the purchase is understood to be made for that purpose by the husband, and he advances the money therefor as a gift, no resulting trust is thereby created in him for the benefit of his creditors.

6. When the person to whom the conveyance is made pays part of the purchase money, no trust results to any one who advances the residue, unless the part of the purchase money paid by him in whose favor the resulting trust is sought to be enforced, is shown to have been paid for some specific part or distinct interest in the estate, for some aliquot part. A general contribution of a sum of money toward the entire purchase is not sufficient.

7. A mortgage given by a husband to a trustee for his wife, after he had become a member of a firm of which she had gone out, to secure to her the capital which she had contributed to the firm, but which had become insolvent before she left it, is void as against creditors of the firm.

8. A mortgage given by a father to secure to a son, money of the son used by the father in the business of the firm, though given when the firm was insolvent, is valid.

9. Mortgage reformed, by substituting "heirs" for "successors," it having been the evident intention to mortgage the fee. Such reformation will not affect a subsequent judgment, the record of the mortgage being the only notice at the entry of the judgment, and that notice being of a conveyance for life only.

These three suits were brought on for final hearing together, each upon bill, answer, replication, and proofs.

Wheeler and Green, the complainants in the first two suits, had, on the 16th day of December, 1869, recovered judgment in the Supreme Court of the state against the defendants, George Kirtland and John Kirtland (who had been partners under the name of Kirtland & Co.,) for $68,246. By an execution on this judgment they had levied upon a lot of

land of six and one-half acres, in Orange, known as the Halsted homestead, the title to which was in the name of Emily G. Kirtland, the wife of George Kirtland; and on a tract of land and messuage, the property of John Kirtland, also in Orange, encumbered by two mortgages to George W. Kirtland, one for $4000 in his own right, and one for $75 to him as trustee for Catharine Kirtland, the wife, and Jared T. Kirtland, the son of John Kirtland, and by a judgment confessed by John Kirtland to George W. Kirtland, in Essex County Circuit Court, for $16,714.42.

The bill in the first suit seeks to have the judgment of the complainant declared a lien on the Halsted homestead, on the ground that the same was purchased and paid for by George Kirtland out of the assets of the firm when insolvent, and the title taken in the name of his wife to protect it from the debts of the firm, and to hinder and defraud their creditors.

The bill in the second suit alleges that the mortgage held by George W. Kirtland on the premises of John, as trustee for Catharine and Jared, was voluntary, and given without consideration when John Kirtland and his firm were insolvent, and seeks to have it declared fraudulent and void as against the complainants and their judgment.

The third suit is by George W. Kirtland to foreclose his mortgage for $4000, and his mortgage as trustee. It also seeks to have that mortgage reformed by correcting a mistake of the scrivener who, in drawing it, had substituted the word "successors" for "heirs," after the name of the mortgagee, in the granting clause; and further, to have the amount due on his judgment made out of the sale of the mortgaged premises. The defendants, Wheeler and Green, contest the *bona fides* and validity of both these mortgages, and of the judgment, and allege that they are all without consideration, and intended to delay and defeat creditors.

*Mr. B. Williamson,* for Wheeler and Green.

*Mr. C. Parker,* for the Kirtlands.

THE CHANCELLOR.

I shall first consider the question with Emily G. Kirtland, as to the Halsted homestead. She was the daughter of M. O. Halsted, an old, respectable, and wealthy resident of Orange, who had lived on this property for more than forty years. Emily had been born there, and had resided on it until she was married to George Kirtland, in September, 1863, and still continues to reside there. She continued, after her marriage, to reside there in the family of her parents until March 5th, 1864, when the place was conveyed to her in fee by her father; after that, she and her husband conducted the establishment, and her father and mother boarded with them. For some time before her marriage her father had talked of selling this place, and asked $25,000 for it. In the winter after her marriage, and for some two months before the conveyance, she had been bargaining with her father for the purchase of this place, and concluded the bargain for the price of $25,000, of which $5000 was to be paid by charging it as an advancement to her, and $20,000 was to be paid in cash. This sum was advanced by her husband by a check of his firm for that sum, intended as a gift to her. She was the only remaining daughter or child, the others having been previously married. Her father gave her the furniture in the house. Mr. Halsted never drew the money for which the check was given, or used it in any way, but handed it the next morning to George Kirtland, who took it back to the firm, giving Mr. Halsted credit in their books for the amount, $20,000. The firm from time to time bought bonds for Mr. Halsted to that amount, their business being that of bankers and stock and exchange brokers in the city of New York. These bonds were left with Kirtland & Co., and were used by them as collaterals for raising money, under an understanding with Mr. Halsted. On the 10th day of November, 1864, Kirtland & Co. failed, and stopped payment, and on the 25th made an assignment of their New York assets for the benefit of certain creditors.

On the 24th day of November, 1864, two weeks after the

failure, Mr. Halsted advanced on a mortgage of the homestead $14,000, which was handed over to George Kirtland for the payment of the debts of the firm, and on the 4th of November, 1865, he loaned $6000 more on a second mortgage on the same property, which was handed to George for the same purpose. These sums, or by far the greater part of them, were used in paying the debts of the firm, part in paying a debt for which $10,000 of Mr. Halsted's bonds were pledged, part in payment of a debt for which $17,000 of borrowed Tennessee bonds had been pledged, and the rest for other debts.

Mrs. Emily G. Kirtland retained possession of her homestead, and the lands having risen much in value, sold different parcels of it for large prices, and with these moneys, and the amount which came to her as her share of the estate of her father, who died in 1866, being about $20,000, she has nearly paid off the mortgages. The judgment of Wheeler and Green in this state was obtained more than five years after the failure, and after these sales and payments.

The above statement of facts is the conclusion to which I have arrived from consideration of the testimony, and is fully established by the evidence.

I shall assume it also as established by the evidence, that the firm of Kirtland & Co. were, on the 5th of March, 1864, largely insolvent, although upon this point there is contradictory testimony. I shall also assume that George Kirtland knew of the insolvency. He denies, under oath, that the firm was then insolvent, or that he thought that it was; and his ignorance of, and incapacity for business displayed in his testimony, if not simulated, is so great that perhaps I should credit him as to his belief.

It is shown to my satisfaction that his wife Emily and her father did not know of, or suspect, the insolvency of the firm at the advance of the $20,000. His wife supposed he was wealthy and doing a good business. This is shown by her responsive answer and testimony, and confirmed by the fact that the complainants, Wheeler and Green, and other dealers

who trusted them with millions, treated and dealt with them as responsible and wealthy. A young wife could not be supposed to suspect her husband in matters as to which she saw experts in business, not related by blood or affinity, trusting him with such amounts. There is no reason to doubt her testimony. That upon the failure, two-thirds of the advance, and, within a year after, the residue of it, was repaid by the wife to the firm from whom it was taken, is established and not disputed.

Wheeler and Green were creditors of the firm at the time the $20,000 was advanced. The firm were their bankers; they deposited their moneys with them, and drew for them as needed. Their account was very active; the debt due to them from the firm at its failure was not the same debt as was due at the advance to Mrs. Kirtland. It may be that there was a time when their account was overdrawn, and the firm owed them nothing. But as at its failure, it owed them over $40,000; as the dealing was continuous, and the overdraft, if any, accidental, I shall assume their rights to be the same as to this property, as if some indebtedness to them had continued from the advance to the failure.

The question then presented is this: if a man when insolvent or in debt, advances money as a gift to his wife or his son, they being at the time ignorant of the indebtedness or insolvency, and they purchase property or enter into business with this money, but afterwards, upon learning of the embarrassment of the donor, pay back in full the amount received, does this transaction impress the property purchased, or the profits of the business in which they engaged, with such an indelible trust for creditors that at any distance of time afterwards the creditors can claim the property purchased and its advances, or the profits made in such business, both before and after refunding the advance?

I am of opinion that if the donee in such case received the money in good faith, supposing that it was advanced by a person perfectly solvent, and that the gift could not injure his creditors, present or future, and was not intended for

such purpose, and the amount is afterwards repaid in full to the source from which it was received, there is no fraud or other ground to infer or to create a trust for future or even existing creditors, in the profits of the business or advance of the property after the money is returned, or even while it is kept in good faith. There is no privity or confidence between the donee and the creditor, or any other thing out of which a trust can arise. Fraud may create a trust; but here is in the donee neither actual nor legal fraud.

I have no doubt that a voluntary conveyance or gift of property, made at this time by Kirtland to his wife, even if received in perfect good faith, would have been void as against his creditors. If the gift had been in money she could have been compelled to repay it; but if it had been repaid or refunded before a creditor obtained a judgment or other lien, she could not again be compelled to pay it to the creditor, unless the payment was made so as to aid her husband in defrauding creditors. It is not necessary to decide whether if the money had not been repaid, the property purchased with it and held by the donee would be in trust for creditors beyond the amount of the advance.

The rights of creditors should be protected. No property of the debtor should be allowed to be conveyed away and held by a donee without consideration or in trust for the debtor. It should be followed in whosesoever hands it may be, except that of a *bona fide* purchaser for value, and given to the creditor. Beyond this the creditor has no right. And there are other persons who have rights to be protected as well as creditors. The wife or son of one who has been unfortunate or attempted to defraud, should not, to gratify a feeling of vindictiveness against a wrong-doer with whom they are so nearly connected, be stripped of what fairly belongs to them. When the creditor has his three thousand ducats he must not seek for the penalty of the pound of flesh or for a single drop of blood.

There can be little doubt, from the great rise in its value

since, that this property, in March, 1864, when it was conveyed, was worth more than $25,000. At that time the depressing effect of the first years of the war was being relieved. The increase of money by the immense circulation of irredeemable legal tender notes had raised the money value of land by reducing the value of money, and if this property in 1860 was worth $25,000, it was worth much more then. The price of $5000, charged by a father to a cherished daughter, was very likely, to his knowledge, below its value, and the conveyance intended as a favor to her. It would be gross injustice to take from that daughter, anxious and uniting with her father to preserve the home of her childhood, all the benefits, advantages, and profits of that purchase above the naked $5000, and hand them over to the creditors of her husband, to whom they never, in law, equity, or right, belonged.

I know of no precedent for declaring the honest recipient of a temporary gift, fully returned, a trustee for the benefit of creditors. The only precedent I find for declaring such a trust is where the property was purchased by the husband himself, and the deed taken in the name of his wife—not for her benefit, but to be held in her name for the benefit of the husband to defraud his creditors.

A trust is held to result by operation of law, where one purchases land with his own money and takes the conveyance in the name of another; in such case the title is deemed to be in trust for him who advanced the money, for the presumption is that he intended to purchase for his own benefit. So where one employs an agent, and furnishes him with money to purchase land, and the agent purchases the land with this money, and takes the title in his own name, a trust results for the principal; but not if one employed as an agent purchases the land with his own money. But if one purchases land and takes the title in the name of his wife or child, it will be held to be a settlement on the wife, or an advancement to the child, unless it is shown to have been otherwise intended, and no trust will result. 2 *Story's Eq. Jur.*,

§§ 1201–1205; *Guthrie* v. *Gardner*, 19 *Wend.* 414. But in such case, if the purchaser takes the deed in the name of his wife or child, for the purpose of defrauding or delaying creditors, and not for the purpose of making a settlement or advancement, a trust will result to the purchaser, and the land be liable to his debts.

In *Belford* v. *Crane*, 1 *C. E. Green* 265, this doctrine was applied by Chancellor Green, and a trust was held to result for the husband, and the land held liable to his debts. But it is put by the Chancellor on the ground that the whole of the property of the husband was put in the name of his wife to place it beyond the reach of his creditors. He says: "The transfer was not made by deed of settlement. There was no declaration of a purpose by the husband to appropriate a specific portion of his property for the use of his wife, but the property from time to time was purchased in the name of his wife, and a house subsequently erected thereon with the means of the husband." And in that case, as the Chancellor declared, every vestige of property that the husband owned was in the name of his wife; and it was held that "the land having been purchased with the money of the husband, there is a resulting trust in his favor." But the reasoning of the case shows that had the land been purchased with a specific sum set apart for a settlement upon the wife, the conclusion would have been different. The gift might have been declared void as against creditors, but no trust could have resulted.

In Guthrie *v.* Gardner the same doctrine was held and applied by Chief Justice Nelson. In that case the husband purchased and paid for the land and took the deed in the name of the wife, for the avowed purpose of keeping the property from his creditors; and the Chief Justice held that it was perfectly clear from the facts that the husband had no intent to make provision for his wife, and a resulting trust arose to the husband; that the fee thus passed to him, and was subject to his debts.

But this is not a case of a purchase made by a husband in

the name of his wife. It was a purchase made by the wife herself, of her father, of the family homestead for her own benefit; she herself made the bargain. I fully believe her testimony on this point. She got from her husband a large part of the purchase money which she paid for the conveyance. There is no authority for the creation of a resulting trust from such facts. When the person to whom the conveyance is made makes the bargain for the purchase for his own benefit, and obtains part, or even the whole of the purchase money from another, who knows that it is to be paid for a conveyance to the grantee for his own benefit, no resulting trust can arise. Else any stranger or banking institution that advances the money to make a purchase that turns out advantageous, might take the property and the profit of the purchase as *cestui que trust*. In this case the purchase was made by Mrs. Kirtland for her own benefit, and was understood to be made for that purpose by her father and her husband. The $20,000 was advanced by her husband as a gift to her. There is no principle or authority on which this can be declared to create a resulting trust in him for the benefit of his creditors.

There is another principle that will prevent in this case a resulting trust. When the person to whom the conveyance is made pays part of the purchase money, no trust results to any one who advances the residue unless, in the language of Justice Hoar, in McGowan *v.* McGowan, "the part of the purchase money paid by him in whose favor the resulting trust is sought to be enforced, is shown to have been paid for some specific part or distinct interest in the estate—for some aliquot part, as it is sometimes expressed." He declares "that a general contribution of a sum of money toward the entire purchase is not sufficient." 14 *Gray* 119. To the same effect are the decisions in *Crop* v. *Norton*, 2 *Atk.* 74; *White* v. *Carpenter*, 2 *Paige* 240, and *Sayre* v. *Townsend*, 15 *Wend.* 647. The doctrine is commented on and approved in *Browne on Frauds*, § 86.

In this case there was no intention to purchase in fifths,

Wheeler and Green *v.* Kirtland.

nor was the advance intended to represent four-fifths, or any aliquot part of the estate; it was the intention of the father to convey the whole estate, upon the payment of $20,000 in cash, and to charge her $5000 only on the advancement, even if the surplus of value was twice that sum.

For these reasons I am of opinion that no trust by reason of any fraud of Mrs. Kirtland, and no resulting trust, did arise or could arise, either for her husband or his creditors. And even if it was a case on which a resulting trust might have arisen, the fact that the whole amount advanced was repaid by her to her husband, for his firm, from which the money was taken, and accepted by them four years before the complainants acquired any lien upon the property, and while the partners had full power to settle their own affairs, would have released the property from the trust. If she had given a mortgage to the firm for this $20,000, payment in 1864 and 1865, if made without fraud, would have discharged it, even although the partners had squandered the money and not applied it to the payment of debts.

In this case the great increase of value has accrued since the $20,000 was refunded and accepted, and it would be gross injustice to declare that the creditors of her husband were entitled to this, if the doctrine of trusts had required it.

The view I have taken of this question being on the assumption that Wheeler and Green were creditors at the time of the advance of the $20,000, and that they continued such until the failure, relieves me from the investigation of the accounts and examinations of the piles of firm ledgers, and accounts exhibited and produced to show that the debt to them at the time of the advance was paid off and discharged long before the failure, and that no part of their present claim is for any debt then existing, and that about the 1st of July, 1864, the firm for a period of some days owed them nothing—questions not without doubt; and also from discussing and applying the question of law, whether an advance made to a wife or child can be questioned by a subsequent creditor, if all debts existing at the time of the advancement

have been paid and settled, and there is no actual intent by the advancement to defraud subsequent creditors.

The bill against Emily G. Kirtland and others must be dismissed.

The suit against Catharine Kirtland, Jared T. Kirtland, and their trustee, George W. Kirtland, presents a different question. Catharine Kirtland was a partner in the firm of Kirtland & Co. at its inception in 1861; her son George was the other partner. She advanced $5200 as capital; George advanced the small amount of $247, and his skill in the business. John Kirtland, the husband of Catharine and the father of George, could not enter the firm, as he was engaged in settling up the affairs of an insolvent firm of which he was a member. His wife went in with his consent, and put in $5200, the amount of a legacy which his brother Jared had originally bequeathed to him, but by a codicil had given to his wife, evidently because of the risks of the business in which John was engaged. In January, 1864, John having, by compromising with the creditors of his former firm, become free from his embarrassments, took the place of his wife in the firm of Kirtland & Co. She went out of the firm and he went in. The name of the firm was unchanged, and the business was continued in the same books, on which no indication of the change appeared. The firm appears to have been insolvent at this time. John paid his wife nothing for her interest; he gave her no note or security, and made no agreement to pay her. No promise could arise by implication of law, as her interest was worth nothing. The old firm of which she was a member would owe her nothing, as her capital had been spent and the firm was insolvent. Had there been assets, she would have been entitled to her proportion of the capital and her equal share of the profits.

Had John Kirtland, when he took the place of his wife in the firm, agreed to pay to her for her interest $5200, and secured it by note or mortgage, although the interest was worth nothing the transaction would have been valid. Neither

he nor his property were then liable to the debts of the firm, and he had power to make such contract, whether provident or improvident. But this was not done. The capital remained in the firm, credited on the books as capital, and in no other way. A bargain to allow her to withdraw her entire capital in cash from the concern, when insolvent, would not be valid as against creditors. A new credit to her of the amount of the capital, if it had been made, would not be legal as a means to effect that end. In November, 1864, John having become a member of the firm, and his individual property as well as his partnership property being liable to the debts of the firm, he could not legally encumber his property to secure to his wife a sum which neither he nor the firm legally owed her—a sum which she having contributed as capital belonged to the creditors. The mortgage to George W. Kirtland, as trustee, so far as the $6000 secured for Catharine Kirtland is concerned, must be declared void as against the complainants, Wheeler and Green. But it is valid to secure the sum of $1500 to Jared T. Kirtland. This was his money, used by his father John, in the business of the firm. It was a just and honest debt to him, for which John Kirtland could give a mortgage or other security to give him preference over other creditors. In that suit there must be a decree confirming the mortgage to George W. Kirtland, so far as the $1500 secured to him as trustee of Jared T. Kirtland is concerned, and declaring the same void so far as relates to the $6000 secured to him as trustee of Catharine Kirtland.

This view disposes of every question about which there can be serious doubts in the third suit by George W. Kirtland for foreclosure of his mortgages, except the reforming the mistake in the mortgage to him as trustee. The making that mortgage to G. W. Kirtland and "his successors," instead of "his heirs," is a mistake of the scrivener. It was, beyond question, the intention of John Kirtland to mortgage the fee, and the mortgage must be reformed by substituting the word heirs for successors. But this reforming will not affect the judgment of Wheeler and Green.

There was no other notice to them at the entry of their judgment than the record of this mortgage. That gave notice of a conveyance for the life of the trustee. If a mortgage is by mistake given for $1000 instead of $10,000, and is so recorded, a subsequent purchaser cannot, by correcting such mistake, be deprived of property which he purchased on faith of the record. The advance of the $4000 by G. W. Kirtland to his brother John, for which the note was given, secured by the first mortgage, is established, and there is no evidence to throw doubt upon the fact or the *bona fides* of the mortgage; and the judgment for $16,714.42 is regular, and not impeached. The complainant in that suit is entitled to a decree for the sale of the mortgaged premises; the several encumbrances to be paid out of it in the order of their dates, and the residue, if any, to be paid to Wheeler and Green upon their judgment.