## THE ECUADORIAN ASSOCIATION

*v.*

## THE ECUADOR COMPANY.

[Decided July 25th, 1905.]

P., never having formally subscribed to defendant's stock, agreed with H. to exchange stock of the E. association for full-paid non-assessable stock of defendant company on a specified basis, and under another agreement giving him the right to £65,000 of the E. association's stock, he authorized its deposit with certain London bankers for the purpose of having it exchanged for stock in question. Such certificate, however, was not delivered to any officer of defendant company, and the certificate of defendant's stock, intended to be issued in exchange, though made out, was never received or accepted by P.—*Held,* that defendant's receiver was not entitled to recover against P., as a stockholder in defendant company, an assessment on the stock intended to be delivered to him.

*Mr. Charles L. Corbin, Mr. De Witt Van Buskirk* and *Mr. Hiram R. Steele* (of the New York bar), for the petitioner.

*Mr. Edwin B. Williamson* and *Mr. Arthur L. Andrews* (of the New York bar), for Robert C. Pruyn.

STEVENS, V. C.

This is an application for leave to levy an assessment upon Robert C. Pruyn for the full amount of the stock of the Ecuador Company, an insolvent corporation, alleged to have been subscribed by him ($325,000), and on which, it is said, he has paid $64,703.74.

The petition alleges that there is no other unpaid subscription for shares. The answer denies that Pruyn ever became a stockholder, or that he ever paid anything on account of stock, or that he is in any manner indebted to the company or to its receiver.

The transactions disclosed by the testimony are considerably

complicated. For the purposes of this decision I shall only refer to those which appear to bear upon the point at issue.

On June 14th, 1897, the government of the republic of Ecuador entered into a contract with Archer Harmon and his associates for the construction and equipment of a railway extending from the port of Guayaquil to Quito, a distance of two hundred and ninety miles. Many engineering difficulties stood in the way, for the road had to climb the Andes, and the cost of construction was therefore great. To build and equip the road the Ecuador government authorized an issue of bonds by the railway company to the amount of $12,282,000. These bonds were to be guaranteed by the government. It also authorized an issue of preferred stock to the amount of $5,250,000 and of common stock to the amount of $7,032,000.

The associates organized, under the laws of New Jersey, the Guayaquil and Quito Railway Company, and in connection therewith the South American Railway Construction Company. The latter company contracted, for the bonds and stocks above mentioned, or some of them, to build and equip the road. The construction company soon assigned its contract to the Ecuador Development Company, another New Jersey company, and this in turn assigned to the Ecuadorian Association, a Scotch company. By December, 1902, the most difficult part of the work had been done, and the road had been nearly completed to the top of the plateau. Before this there had been considerable difficulty in procuring money, the bonds selling at times below one-half of their face value. As the work had progressed portions of the bonds had been handed over by the Ecuador government, and these were either sold or pledged to raise funds. The Ecuadorian Association itself issued debentures, secured by an assignment of its property and rights to trustees. Money being still needed, the gentlemen connected with the Ecuadorian Association sought assistance from the United States, and obtained it from a firm of bankers, Messrs. Dick & Lisman, who agreed to give it, however, only on the terms that the books of the construction company should be sent to New York and its affairs conducted in that city. For their further protection, they in-

sisted that a voting trust should be formed, by means of which they might control the construction company's policy.

Such was, in brief, the situation in December, 1902, when Mr. Pruyn, an Albany capitalist, was induced to connect himself with the enterprise. The evidence shows very clearly that at that time it had become evident that the success of the road was assured. It had been built completely, and was in operation, almost to the summit of the mountain plateau. The rest of the construction was easy. Archer Harmon, the president of the railway, and his brother, Major Harmon, seem to have been, because of their great pecuniary interests, more interested or bound up in the enterprise than the other gentlemen connected with it. Archer Harmon says that he approached Mr. Pruyn for two reasons: *First,* that he might obtain from him the funds with which to go on, and *second,* and principally, that he might eliminate Messrs. Dick & Lisman. It is evident, however, that he was greatly in need of money for construction.

On December 10th, 1902, Mr. Harmon submitted to Mr. Pruyn a detailed statement of the situation. The letter (*Exhibit C 8*) is found on page 130 of the printed case. It gives a history of the construction and a statement of the assets and liabilities of the Ecuadorian Association. It tells to what extent and how the securities were pledged, and then refers to certain collateral undertakings to be prosecuted in connection with the principal one. Of these, the more important were the development of the Colombe coal mines and of the Duran property, the latter a tract of ten thousand acres on the river front, opposite the city of Guayaquil, which, it was thought, could be utilized for terminal purposes, and would soon become very valuable. This latter property the Ecuadorian Association had an option to purchase. The proposition first made to Mr. Pruyn is contained in another letter, also dated December 10th (at page 13 of printed case). The proposition, in brief, was that Mr. Pruyn should purchase the capital stock remaining in the treasury of the Ecuadorian Association to the amount of £65,000, its total capital stock being £500,000. This would enable the association to acquire the Duran property at a cost of $90,000, to construct

coal docks thereon at a cost of $30,000, and to proceed with the development of the coal mines at a cost of $30,000, and it would enable Harmon (Mr. Pruyn co-operating) to outvote the voting trust. If Mr. Pruyn would do this Mr. Harmon engaged to secure for him an option on a further £40,000 of Ecuadorian stock at fifty cents on the dollar, and make the management of the railway and construction companies entirely satisfactory to him. Pruyn and Harmon met at lunch about five days later. A counter proposition was then made by Pruyn. It contemplated the organization of a new American company with a capital stock of $5,000,000, just double that of the Ecuadorian Association. Of this stock the Ecuadorian shareholders were to have one-half and Pruyn and his associates the other half. The Ecuadorian Association was, speaking generally, to assign its assets and contract rights to the new company, and Pruyn and his associates were to provide cash to the amount of $435,000, of which $90,000 was to go to the purchase of the Duran terminal property, $30,000 to docks, $30,000 to coal mines, $35,000 to lands at the base of the mountains, and the balance, $250,000, to a working capital. No final agreement was reached at that time. On December 31st both Pruyn and Harmon sailed for England. Pruyn was accompanied by his wife, and appears to have gone abroad mainly for pleasure and only incidentally on this business. In London he met several of the Ecuadorian directors and others connected with the enterprise. It seems to have impressed him very favorably, but no definite agreement covering the entire matter was made until he reached Paris, late in January, 1903. Prior to that date, however, Mr. Pruyn had directed that the Duran Terminal Company should be organized, and this had been done by his agents in New York. The Paris interview appears to have resulted in a definite arrangement. Mr. Harmon says (at page 27 of printed case), and his evidence is uncontradicted, that they agreed to organize the Ecuador Company and certain other companies, in addition to the Duran company; that the Ecuador Company, when organized with a capital stock of $5,000,000, was to issue to the shareholders of the Ecuadorian Association stock to the amount of $2,500,000

on the basis of $5 of stock for each £1 share. The other half of the stock was to be exchanged for the stock of the various land companies formed or to be formed. As I understand Mr. Harmon's testimony, the money to be contributed was specified in the so-called midday memorandum (at page 130) made by Mr. Pruyn prior to his leaving New York, and such is the statement contained in Harmon's letter to Pruyn under date of February 12th (at page 167 of case). Various other details were mentioned in the Paris conference, to which I need not refer.

Immediately upon Mr. Harmon's return from Paris to London arrangements were made in London to carry this undertaking into effect. The Ecuador Company was organized in New Jersey by Pruyn's New York agents, and a very elaborate assignment from the Ecuadorian Association to that company was drafted and submitted, through the mail, to Mr. Pruyn for his approval. A meeting of the shareholders of the Ecuadorian Association was called and their assent procured, and on February 17th, apparently with the consent of everybody interested —certainly without any active opposition—the assignment (at page 173 of case) was executed by the Ecuadorian Association on the one hand and by Mr. Green, Pruyn's London representative, and the agent of the Ecuador Company, authorized for that purpose, on the other. All the companies to be organized under the agreement (the Ecuador Company, the Duran company, the Villamil company, the Colombe Coal Company) had been organized prior to February 11th, as appears from Mr. Lockwood's letter of that date (at page 161). Upwards of $60,000 were advanced by Pruyn to the Ecuador Company between February and June for the purpose of carrying the agreement into effect.

I do not understand that there is any dispute whatever in reference to any of the foregoing matters, but a recital of them is essential to an understanding of the question in controversy. That question is whether, as a result of the whole arrangement, Pruyn became a subscriber, either expressly or as a necessary consequence of what was done, for three thousand two hundred and fifty shares of the Ecuador Company.

I have stated that Harmon's first proposition to Pruyn was

that he, Pruyn, should subscribe for £65,000 of the shares of
the Ecuadorian Company lying in the treasury unissued. The
case shows that from beginning to end Harmon was extremely
anxious to have this stock held by one of his friends, so that he
could, with their assistance, outvote the voting trust controlled
by Messrs. Dick & Lisman, the New York bankers. As Pruyn
was unwilling to buy in this way, Harmon sought to secure the
end in view by other means. If Pruyn was unwilling to pay so
much money for the shares, he was not unwilling, as a part of
the whole scheme, to take them in exchange for the stock of the
Duran Terminal Company. The first proposition, having this
object in view, is thus stated in the brief of Pruyn's counsel:

"As summed up by Mr. Harmon in his letter to Mr. Pruyn of December 20th, 1902, it was definitely but still tentatively arranged that an optional agreement should be entered into between the Ecuadorian Association and Mr. Pruyn, whereby the Ecuadorian Association should agree to deposit sixty-five thousand shares (of £1 each) of its capital stock in escrow with Glyn, Mills, Currie & Company (London bankers), and Mr. Pruyn should agree to procure the incorporation of the Duran Terminal Company, and to cause all of its capital stock to be likewise deposited, and if within six months from this date the purchase and transfer of the Luque estate (*i. e.*, the terminal lands) to the Duran Terminal Company is effected and title made satisfactory to the attorneys of the Ecuadorian Association, and you (Pruyn) shall have deposited in the treasury of the Duran Terminal Company the sum of $36,000, and said Duran Terminal Company shall be free from debt, the Union Trust Company of Albany, or Glyn, Mills, Currie & Company, shall deliver to you the £65,000 of the fully-paid capital stock of the Ecuadorian Association, Limited, and deliver to us the entire capital stock of the Duran Terminal Company; otherwise you shall at once restore the John Haviland option, upon the Ecuadorian Association reimbursing you for your actual outlay on the Duran Terminal Company."

Before sailing for Europe, Adams, Pruyn's representative in
New York, had been instructed to pay $5,000 to secure the
extension of the option, and the money had been actually paid.
On February 13th Mr. Adams wrote Mr. Lockwood, the counsel
of the parties in New York, asking that he forward a copy of
the escrow agreement relating to the Duran terminal, which he,
Adams, had signed on Tuesday (at page 169). What the terms
of the agreement were we can only conjecture from what appears
in the passage I have quoted. Mr. Pruyn has not seen fit to put

the paper in evidence, although, as it seems to me, on the theory of subsequent misrepresentation now advanced by his counsel, it was quite important for him to have done so. This escrow agreement was, on February 24th, superseded by an agreement signed in Rome, where Pruyn then was, which provides as follows:

"1. The (Ecuadorian) Association agrees to acquire, and does hereby acquire from said Pruyn the entire capital stock ($500,000), less five shares, to qualify directors of the Duran Terminal Company, and hereby agrees to issue sixty-five thousand of its shares, to be issued as fully paid, in consideration therefor, and the association undertakes to file, at the Somerset House, the necessary contract covering the issue of its shares fully paid.

"2. Said Pruyn undertakes and agrees to deliver to the Association, or to Ecuador Company of New Jersey, for its account, the entire capital stock, less five shares to qualify directors of the Duran Terminal Company, and undertakes that on or before July 1st, 1903, the Duran Terminal Company shall own the said properties known as the Luque estate, opposite the city of Guayaquil, embracing about ten thousand acres, more or less, free and clear of all encumbrance."

It is contended by counsel that this second agreement was obtained from Pruyn by misrepresentation. Mr. Pruyn was not sworn, and I do not find in the case any evidence whatever to support this charge. Mr. Pruyn appears to have been, from the beginning, most careful. The agreement was accompanied by a letter from Mr. DeFriese, a London barrister, representing Harmon and the association. In his letter of February 19th, Mr. DeFriese says:

"I thought it wiser, if possible, to do away with the escrow provided for and issue the sixty-five thousand Ecuadorian shares to you in exchange for the Duran Terminal shares, the latter to be handed over to the Ecuador Company in New Jersey for account of the association."

In view of this explicit language and of the clear language of the agreement, it is idle to argue that Mr. Pruyn—a very intelligent business man—did not know that the optional feature of the agreement had not undergone a change. And it was a change, too, that appears to have been almost necessitated by the provisions of the deed of transfer of the Ecuadorian Association to the Ecuador Company, a draft of which had been sub-

mitted to, and without doubt approved by, Mr. Pruyn before its execution. In this deed there is the following recital:

"And whereas, the Duran Terminal Company, a corporation duly organized, * * * *has* acquired a certain freehold estate known as the Luque property, situate in the republic of Ecuador, and containing about five thousand acres, including the site of the town of Duran and the river front of the Guyas river; * * * and whereas Robert C. Pruyn, as the beneficial owner of all the stock of the Duran Company, *has* sold the same to the association in consideration of the allotment or transfer to him of sixty-five thousand full-paid shares, of £1 each, in the capital of the association."

In view of this provision, which would have amounted to a fraudulent representation of a material fact if the Duran property had not been transferred to the Duran company incorporated for the very purpose of taking it, I am not surprised that Mr. DeFriese, in his letter of February 19th, should have said to Mr. Pruyn that he "thought it wiser, if possible, to do away with the escrow."

Now, it may be asked, what necessary connection is there between Pruyn's agreement of February 24th, which did away with the escrow, and his subscription to the capital stock of the Ecuador Company? It appears to have been this: In order to interest Mr. Pruyn and his American associates in an enterprise that had been attended with many financial embarrassments it was necessary to offer inducements. These inducements could not very well be expressed or embodied in the signed documents. The scheme finally agreed upon at the Paris conference was, in substance, this: The Ecuadorian Association needed money, and Mr. Harmon and his Scotch and English associates had become tired of their connection with the Dick-Lisman syndicate. To procure funds and to outvote the syndicate were matters of prime importance. Both of these objects would be attained by the incorporation of the Ecuador Company, with its capital of $5,000,000, one-half of which would represent the property and rights of the Ecuadorian Association to be transferred and the other half of which would go to Pruyn and his associates upon their contributing $435,000 in cash (at page 167). Of course, it would not do to put the matter in this way

on the face of the papers, because then Pruyn would be liable to assessment for the difference between $2,500,000 and $435,000. And so the scheme of incorporating the various subordinate companies was agreed upon for this and doubtless for other reasons, and it was arranged that the stock of these companies should be exchanged for the stock of the Ecuador Company to the extent mentioned. To get rid of the inconvenience of the voting trust it was necessary to issue the £65,000 of shares in the treasury of the Ecuadorian company. Mr. Pruyn had, from the outset, declined to pay cash for these shares, and English law, like New Jersey law, required that for their issue there must be an equivalent in cash or property, and so *this* scheme was devised. The shares of the Ecuadorian Association were to be issued in exchange for the Duran shares, without, of course, stating that the Duran shares represented or would represent a total cash outlay of $126,000, while the Ecuadorian shares should have represented cash or property to the amount of £65,000, or $325,000. Mr. DeFriese, in his letter of February 19th, writes to Mr. Pruyn, "I did not wish in the contract a recital of the purchase price of the terminal properties," the reason intimated being that the contract would have to be filed at Somerset House. This contract, standing alone, gave the Ecuadorian shares to Mr. Pruyn and the Duran shares to the Ecuadorian Association. But that was not the ultimate intention. The transfer of February 17th provided that the Duran company's stock should go to the Ecuador Company, and the effect of the two documents was to give to Pruyn the Ecuadorian stock and to give to the Ecuador Company the Duran stock. But the scheme was to vest at least a majority of the shares of the Ecuadorian Association, held by persons favorable to the Harmon interest, in the Ecuador Company, a large majority of whose stock would thus be controlled by that interest, and so the final step was to provide that Pruyn should transfer the £65,000 of Ecuadorian stock to the Ecuador Company and that the Ecuador Company should issue to Pruyn in exchange $325,000 of its stock as fully paid.

There is another matter which I must now refer to, because

it bears directly upon the question in this case. If the deed of transfer from the Ecuadorian to the Ecuador Company had been made and the transaction had rested there, the stockholders of the Ecuadorian company would have been stripped of their property without having acquired any interest in the new company. But the plan was to substitute the stock of the Ecuador Company for the shares of the Ecuadorian Association. Three circulars were accordingly prepared and sent out, which bear date on the date of the execution of the deed. One of these circulars, addressed to the shareholders of the association, informs them that "in order to avoid the abandonment by the association of the construction contract," the directors had concluded to accept the offer of the Ecuador Company to take over its obligations and liabilities, "with certain other assets," and to undertake to complete the line. Another circular, signed by several of the larger shareholders of the Ecuadorian Association, including Mr. Adams as attorney for Mr. Pruyn, advises the shareholders to exchange their shares for shares or stock in the Ecuadorian company. As Mr. Pruyn did not then own any other shares in the association, Mr. Adams' signature is necessarily attributable to the £65,000 of shares which Pruyn had agreed to acquire. The circular was a representation that he was a holder of shares. A third circular was signed by Mr. Green for the Ecuador Company of New Jersey. It states that, at the request of certain shareholders of the Ecuadorian Association,

"we have agreed to issue to them a fully-paid share of $100 each of $100 stock in our company in exchange for every twenty shares of £1 each held by them in the Ecuadorian Association."

This circular notifies the Ecuadorian shareholders of the willingness of the Ecuador Company to issue the stock,

"provided you agree to accept this offer on or before the 2d day of March, 1903; sign and forward to Messrs. Glyn, Mills, Currie & Company, * * * bankers, * * * the enclosed form of acceptance, and that you subsequently, but not later than the 10th of March, 1903, lodge with the said bankers the certificate for your shares, together with a blank transfer executed by you in exchange for a receipt by the bankers."

On March 4th (at pages 79, 219) Mr. DeFriese wrote to Mr. Pruyn at Naples, suggesting that the £65,000 be issued to him in one certificate, and that he transfer the certificate and attach it to the letter of the Ecuador Company agreeing to exchange for the shares in that company. He encloses a transfer, which he asks him to sign, and concludes by requesting that "he return them all to me and I will have the certificate issued and file them all with Messrs. Glyn, Mills, Currie & Company." The reply to this letter is not in evidence, but that Pruyn did as requested there can be no doubt. He was at that time, as his letters show, in hearty accord with what was being done, and on March 10th Harmon writes Pruyn as follows:

"I find that there has been deposited with Messrs. Glyn, Mills, Currie & Company £173,000 shares of the Ecuador Association, and I have had deposited to-day £65,000 of the shares issued to you, making a total of £238,000. And there has been deposited with the United States Trust Company about £38,000. This gives us a clear majority of the shares of the Ecuadorian Association, and I feel perfectly safe, as there are only outstanding, excluding the stock deposited under the pooling agreement with Dick, Lisman & Harmon, about forty-five thousand shares."

In the certificate book of the Ecuador Company appears the following entry: "No. 291. 3250 shares issued to Robert Clarence Pruyn April second, 1903." Like certificates were issued to Ecuadorian shareholders and were sent to London, but they do not appear to have been actually exchanged. The reason, so far as the case shows, seems to have been this: When Mr. Pruyn returned to this country he was informed by his secretary, Mr. Adams, that he, Adams, had received a letter from Mr. Lockwood, the New York counsel, strongly condemning the change from the optional Duran agreement to the obligatory one. It appears that duplicates of this latter agreement had been signed, one by Green in London for Pruyn on February 23d, and the other by Pruyn himself in Rome on February 24th. When Pruyn heard that Lockwood had condemned it, forgetting that he had himself signed a duplicate, he repudiated Green's act and sought to have a new agreement made which would, as at first, leave it optional with him whether he would or would not

purchase the terminal property.   The New York Ecuadorian directors were, on his representation that Green's act was unauthorized, at first inclined to accede to his request, but when they heard from Harmon that he, Pruyn, had himself signed a duplicate they refused to release him.   From this time on Pruyn assumed a hostile attitude, and the Ecuador Company, so far as the evidence shows, ceased to concern itself with the construction of the railway.   Pruyn did not take the certificate of Ecuador stock prepared for him.

On this state of facts, the question is whether Pruyn is now assessable as a stockholder of the Ecuador Company, holding three thousand two hundred and fifty of its shares.

He never made a formal subscription to its stock.   He never, in person, agreed with the company to take its stock.   He did agree with Harmon that he would exchange stock of the Ecuador Association for stock of the Ecuador Company on the basis of twenty one-pound shares of the association for each $100 share of Ecuador stock.   If this were all, I think it would be quite impossible to assert that his agreement with Harmon made him an assessable stockholder.   If A agrees with B that he, A, will subscribe for shares in a company and fails to do so, he may be liable to B for breach of his contract, but the agreement does not make him a subscriber.   "The doctrine of the court of chancery," said Justice Depue, in *Crowell* v. *Hospital of St. Barnabas, 27 N. J. Eq. (12 C. E. Gr.) 654* (and *a fortiori* of the courts of law where a suit to recover the amount of the assessment would be brought), "is that, as a general rule, as to strangers to the contract who are also strangers to the consideration, the parties may, at their pleasure, abandon it and mutually release each other from its performance, and upon such rescission and abandonment the contract is completely at an end, and thereafter cannot be enforced."

But the case goes a little further.   Pruyn, under the evidence, became bound to perform the agreement respecting the Duran terminal property.   This agreement gave him the right to the £65,000 of Ecuadorian stock, which was in fact issued to him. And he authorized its deposit with the bankers, Glyn, Mills,

Currie & Company, for the purpose of having it exchanged for stock of the Ecuador Company. The Ecuador Company, in the circular letter to which I have already alluded, offered to give its stock in exchange for such Ecuadorian stock as should have been deposited with those bankers by a certain time. Pruyn's Ecuadorian stock, by his authority, was so deposited, and hence, as it seems to me, there are present in the transaction all the elements of a contract between the Ecuador Company and Pruyn—an offer and an acceptance of that offer by an unequivocal act. There was, therefore, a binding contract to take stock and to pay for it in a particular way, but I do not find in the evidence that this contract was executed. The Ecuadorian certificate was not delivered to any officer of the Ecuador Company, and the Ecuador certificate, though made out, was not received and accepted by Pruyn. The question then comes to this: Can Pruyn be compelled to become a stockholder on any other terms than had been agreed upon? The agreement was that he should receive a certificate of full-paid, and consequently of non-assessable, stock in exchange for his Ecuadorian stock. If his stock is now assessable it must be so because of some legal rule that overrides and contravenes the agreement. I know of no such rule. The Ecuador Company might, while the matter was *in fieri,* have refused to deliver its stock certificate if the Ecuadorian stock were not in fact a fair equivalent. Such was the ruling of the court of errors and appeals in *Donald* v. *American Smelting Co., 62 N. J. Eq. (17 Dick.) 729.* But it was said in that case that after stock had been actually issued as full-paid stock, and the consideration received for it in property, the judgment of the directors as to the value of the property was, in the absence of actual fraud, conclusive, and that such stock was not liable to any further call.

In *Bickley* v. *Schlag, 46 N. J. Eq. (1 Dick.) 533,* certain steamboats and other property had been conveyed to a steamboat company for stock, issued as full-paid. The vice-chancellor who heard the case below had found as a fact that the amount of the stock, at its face value, exceeded the value of the property, and gave judgment for the difference. On appeal, Chief-Justice

Beasley, quoting from an opinion of Judge Field in the supreme court of the United States, said: "Where the charter authorizes capital stock to be paid in property, and the shareholders honestly and in good faith put in property instead of money in payment of their subscriptions, third parties have no ground of complaint. The case is very different from that in which subscriptions to stock are payable in cash and where only a part of the installments has been paid. In that case there is still a debt due to the corporation, which, if it become insolvent, may be sequestered in equity by the creditors as a trust fund liable to the payment of their debts. But where full-paid stock is issued for property received there must be actual fraud in the transaction to enable creditors of the corporation to call the stockholders to account."

These citations are decisive of the matter. There was an agreement between Pruyn and the Ecuador Company, but it had not been consummated by the delivery of the stock on either side. It was an agreement that remained to be performed. Had Pruyn sought to enforce it, the receiver would have considered, *first,* whether it was a fraud upon the company. If it was, he would have repudiated it on that ground. *Second,* if not fraudulent in fact, whether he was getting a fair equivalent for the Ecuador stock at its face value. If he was not, he would have refused to perform it on the principle laid down in the *Smelting Case.* *Third,* if he was getting a fair equivalent, he must have performed it according to its terms. If thus performed, he could not have revalued the property taken and then sought to assess the stock as partly unpaid.

It would seem to be clear, therefore, that if the agreement is binding, or if the receiver elects so to treat it, he must accept and enforce it as made. If he disaffirms or repudiates it, Pruyn's relation to the company as a stockholder, actual or potential, *ipso facto,* ceases.

I think the receiver's application to assess should be denied.