This bill is filed by the Allenhurst Park Estates, Incorporated, a corporation of the State of New Jersey, against the defendants Sidney S. Smith, the estate of George E. Russell, Fanny B. Russell, executrix of that estate; Paul S. Smith and Carrie Chapot, for the purpose of recovering from the defendants Sidney S. Smith and the Russell estate alleged secret profits obtained by these defendants on the organization of the complainant corporation, and seeks the cancellation of a sales agreement between complainant and Sidney S. Smith and George E. Russell; the cancellation of certain contracts for the sale of lands to the defendant Paul S. Smith, and a decree directing him to pay the complainant certain moneys alleged to be due the complainant for the purchase of its debenture bonds by this defendant, and a decree *Page 584 
declaring certain stock of the complainant company held by the defendant Carrie Chapot to be null and void, as fraudulently issued.
The bill charges that Sidney S. Smith and George E. Russell were trustees of the complainant company for the purchase of certain lands and stood in a fiduciary relation to the company when organized; fraudulently concealed from it the real facts and circumstances surrounding the purchase of said lands; refused to make complete disclosure of these facts and circumstances; misrepresented to the company that they had paid $15,000 in cash on account of the purchase price of said lands under the terms of a contract of sale, and that it was their duty to furnish the company with an independent or impartial board of directors, which they failed to do. The bill demands an accounting from the defendants Sidney S. Smith and the Russell estate for $10,000 in bonds of complainant company received by them upon the assignment to the company of a contract for the sale of certain lands as hereinafter detailed; charges that the purchase price of said lands was, in fact, $190,000 and not $200,000, as represented by Smith and Russell; charges conspiracy to defraud the company and investors therein; charges that a sales contract between the company and Smith and Russell was fraudulently obtained and therefore invalid; but that, if valid, was broken by failure of performance on the part of Smith and Russell; that the sales contract was joint and was therefore terminated by the death of Russell; charges the unauthorized alteration by the defendant Sidney S. Smith of contracts for sale of lots to the defendant Paul S. Smith, who is a son of the defendant Sidney S. Smith, and then demands the surrender and cancellation of said contracts. The bill also charges that all stock held by the defendant Sidney S. Smith and the Russell estate is held by them as trustees for the corporation.
The bill prays a discovery and disclosure of the true consideration paid for the lands conveyed to the company and an accounting for the secret profits on the sale of said lands, bonds and stocks, and of the expenditure and disbursement of the company's money; that the issue of the company's *Page 585 
stock to Smith and Russell be declared void for failure of consideration, and restraint against the disposal of said stockpendente lite; that the sales contract executed by the complainant company and the defendants Sidney S. Smith and George E. Russell be declared void because of failure of consideration and lack of authority on the part of those who signed it for the company, and because of its alleged breach by Smith and Russell, and that Sidney S. Smith and the Russell estate be declared to be trustees of the stock and bonds of the company held by them for the complainant.
This controversy arises out of the following state of facts: The defendants Sidney S. Smith, and George E. Russell, now deceased, were real estate brokers in the city of Newark. One Leon F. Blanchard owned a tract of some sixty acres of land located near Allenhurst, New Jersey, and had owned this land for many years. He placed the property in the hands of Smith for sale at a price of $200,000, and agreed to pay him a five per cent. commission on the sale of said lands. His terms were $50,000 cash and the balance on mortgage. This was the arrangement as long ago as 1898. Smith had been unable to dispose of the property on those terms, but in the latter part of 1924 or early part of 1925 Smith interested George E. Russell in the property, and after some negotiations with Blanchard through his son Wallace H. Blanchard, Smith and Russell decided to buy the land, and an understanding was reached between them and Blanchard, by which they were to purchase the lands for $200,000, $25,000 in cash and the balance of $175,000 on mortgage. Fifteen thousand dollars of the cash payment was to be paid on the signing of a contract and the balance of $10,000 cash on settlement and delivery of the deed. Blanchard agreed to credit Smith and Russell with the $10,000 commission on account of the initial cash payment. Pursuant to the plan to purchase and in order to avoid the necessity of their respective wives signing deeds to purchasers of lots, and to better finance the development of the land, Smith and Russell decided to incorporate a company, sell the land to this company and develop it through the medium of a corporate *Page 586 
enterprise. Their plan contemplated the issuance to them of all of the stock of the proposed company, which stock was to have no par value, and to finance the company's operations by the issuance and sale of its debenture bonds. These plans having been completed, the certificate of incorporation of the proposed company was prepared on April 8th, 1925, executed and recorded in the Essex county clerk's office on April 11th, 1925, and filed in the office of the secretary of state on April 14th, 1925. The charter provided for three thousand shares of no par value stock and authorized the company to engage in a general real estate business. Sidney S. Smith, George E. Russell and Wallace H. Blanchard were the incorporators, and each subscribed for one share of stock. At about the same time a formal written agreement of sale between Blanchard and Russell, incorporating the terms of their verbal understanding, was prepared by Mr. Suderly, the attorney who also prepared the papers and supervised the incorporation and organization of the complainant company. This contract of sale was not executed by the parties, however, until April 28th, 1925, when Mr. Russell paid Leon F. Blanchard $5,000 in cash and delivered to him two receipts for $5,000 each, signed respectively by himself and Sidney S. Smith for their agreed commission on the sale of said lands. This, under the agreement with Mr. Blanchard, made up the $15,000 cash payment on the execution of the contract. The balance of the cash payment was to be made on the delivery of the deed. The $5,000 in cash paid to Mr. Blanchard by Mr. Russell was obtained from Mr. Marvin T. Rice, who, on April 14th, 1925, had been induced by Mr. Russell to enter into an agreement for the purchase of $10,000 par value of the debenture bonds of the complainant corporation to be paid for $100 down, check for which, to the order of Allenhurst Park Estates, Incorporated, was drawn and delivered to Mr. Russell on that day; $4,900 when a certain mortgage held by Rice and payment of which was anticipated by him in the near future, was paid, and the balance in sixty or ninety days. The agreement to purchase these bonds was in writing and signed by Rice, and by Russell as agent for *Page 587 
the complainant company. It also provided that upon the payment for these bonds there would be issued to Rice one share of the stock of the company for each $100 of bonds paid for. This stock, according to Mr. Rice's own testimony, he understood was to be given to him as a bonus on the purchase of said bonds. The $5,000 thus received from Rice and paid to Blanchard was undoubtedly the company's money loaned to it on the security of its debenture bonds; but it did not represent the proceeds of "share capital."
On April 28th, 1925, after the execution of the contract with Blanchard, the organization meeting of the complainant company was held. Before proceeding with the organization, however, Smith assigned to Mr. Suderly the one share of stock subscribed for by him, and Russell assigned to his son, W. Benton Russell, the share subscribed for by him, and Suderly, W. Benton Russell and Wallace H. Blanchard then proceeded with the organization meeting. After the usual formal matters had been taken care of, there was presented to the company a written proposition from Smith and Russell, in which they offered to sell and assign to the company the contract for the purchase of the lands above mentioned which they had just obtained from Leon F. Blanchard for the sum of $15,000 in six per cent. debenture bonds of the company and two thousand nine hundred and ninety-seven shares of the no par value stock, with the understanding that the company was to assume the obligations of Smith and Russell under said contract. A resolution was then adopted by the stockholders referring this proposition to the board of directors and recommending its acceptance. The stockholders then, by resolution, authorized the board of directors to issue unsecured six per cent. debenture bonds of the company to an amount not exceeding $100,000, of which $15,000 in par value was authorized to be delivered to Smith and Russell on account of the purchase price of said contract of sale, and the balance to be disposed of for cash or property at the discretion of the board of directors, but at not less than par and accrued interest. Russell and Smith offered to sell these debenture bonds for the company without cost to the *Page 588 
company, and when and if necessary, give to the purchasers of such bonds a bonus of certain of the stock of said company owned by them providing the company would constitute them sole sales agents for its real estate for a period of five years at a commission of ten per cent. on the sales price. The board of directors was authorized to enter into such an arrangement. After the organization meeting and on the same day the meeting of the board of directors was held. This board was composed of Wallace H. Blanchard, W. Benton Russell and Mr. Suderly, who were elected by themselves as directors at the preceding stockholders' meeting. At this meeting a resolution was adopted accepting the offer of Smith and Russell to sell the Blanchard contract to the company on the terms above stated and adjudging and declaring that the contract was of the fair value of $18,000, being $3,000 in excess of the $15,000 paid on account by Smith and Russell. This declaration of value was, of course, ineffective in creating value and was not at all conclusive. Thereafter, the directors adopted the following resolution:
"Resolved, That the directors of this corporation place a value upon the capital stock of this corporation for the purpose of sale for cash or other consideration of one dollar per share, and that the said stock be issued by the proper directors of the company at this rate and they are further authorized to sell and dispose of said stock at the value of one dollar per share. And if said stock is issued for the purchase of property, it shall be of value equaled to the stock issued and delivered therefor."
Nor could this resolution of itself give the stock any actual value if it had none before. It conferred upon it merely a nominal value for purposes of sale; but why it was adopted I am unable to understand, as no sale of stock by the company was contemplated and the entire authorized issue had already been allotted to Smith and Russell by the formal acceptance of their offer. The board then adopted a resolution accepting the proposition of Smith and Russell to sell the company's bonds, and authorized the execution of a contract appointing them sole sales agents of the company's real estate for a period of five years at a commission of ten per *Page 589 
cent. W. Benton Russell was elected president and Fordyce E. Suderly was elected vice-president and secretary. Wallace H. Blanchard was elected treasurer. After the adoption of the foregoing resolution W. Benton Russell resigned as president and director, and his father was appointed to fill both vacancies. Fordyce E. Suderly then resigned as vice-president, secretary and director, and Sidney S. Smith was thereupon appointed to fill these vacancies. Mr. Wallace Blanchard acted as secretary protem. during the interval between the resignation of Suderly as secretary and the appointment of Smith to fill that vacancy. A resolution was also adopted at this meeting authorizing the issuance to Smith and Russell of two thousand nine hundred and ninety-seven shares of the no par value stock of complainant company, and a further resolution was adopted declaring that the three shares of stock subscribed for by the incorporators should be considered as paid for by the assignment of the Blanchard contract to the company by Smith and Russell. The meeting then adjourned until the following day, April 29th, 1925, at two P.M., and at which time it reconvened. Mr. Rice, who had agreed to purchase the company's debenture bonds, as above recited, appeared at this adjourned meeting and was elected a director, and participated in its deliberations and proceedings. The minutes of that adjourned meeting contain a resolution which, after reciting the provisions of the contract between Blanchard and Smith and Russell, and its assignment to the company and the proposed date of settlement, authorized the execution of a purchase-money mortgage for $175,000 to Mr. Blanchard, and the payment by the company of the balance of $10,000 in cash on receipt of deed. The minutes also record that at this meeting Mr. Rice subscribed for $5,000 in bonds of the company for which he was to give the company his note. A meeting of the board of directors was also held on May 4th, 1925, which was attended by all of the directors, including Mr. Rice; and on May 7th, 1925, another meeting was held at which Mr. Adrain H. Chamberlin subscribed for $5,000 of the company's debenture bonds and was elected a director of the company. Thereafter, *Page 590 
meetings of the board of directors were held weekly or at frequent intervals at nearly all of which these five directors were present. The company's bonds to the par value of $15,000 were delivered to Smith and Russell in accordance with the agreement for the assignment of the contract of sale as above recited, and the capital stock of the company was issued from time to time to Smith and Russell or to their nominees on their written order. Evidently these bonds had all been prepared for execution and delivery some time prior to the organization meeting, as debenture bonds of the par value of $5,000 out of the $15,000 issued to Smith and Russell were delivered by them to Rice on April 29th, 1925. On their written order, fifty shares of stock of the company were also then issued to him. A like amount of stock was issued to Chamberlin after his subscription for bonds and two hundred shares of stock were issued to Wallace H. Blanchard on written order of Smith and Russell as a gift to him in view of his services to them in arranging the contract with his father. On April 8th, 1925, Henry R. Elting agreed with Mr. Russell to purchase $5,000 in par value of the company's debenture bonds when issued, and gave Mr. Russell on that day his check for $500 on account, drawn to Mr. Russell's order as agent for Allenhurst Park Estates. This check was apparently deposited in W. Benton Russell's personal account and was not credited in the accounts of the company until some time in May, after the company had been completely organized and its books of account opened. On April 28th, 1925, when Rice delivered the $5,000 in cash to Smith and Russell, they signed a receipt to Mr. Rice in the form following:
"April 28, 1925
Received from M. Townsend Rice the sum of $5,000 as and for the purchase of ten bonds of Allenhurst Park Estates, Inc., of the par value of $500 each, together with 50 shares of capital stock of Allenhurst Park Estates, Inc., to be delivered to M. Townsend Rice by us April 29, 1925, at one o'clock in the afternoon at the office of Allenhurst Park Estates, Inc., 16 Clinton St., [Room 24], Newark, N.J.
 GEORGE E. RUSSELL, Agent
SIDNEY S. SMITH, Agent." *Page 591 
At the meeting of the board of directors, held on May 7th, 1925, the offer of Mr. Edward T. Mitchell to purchase $5,000 worth of bonds and to give his note for that amount in payment therefor was presented and accepted. From the proceeds of the sale of the bonds to Mitchell and Chamberlin, evidently, the final cash payment under the Blanchard contract was made and title to the property obtained.
This bill is based on the claim that Smith and Russell were promoters, and as such stood in a fiduciary relation to the complainant company, and were, therefore, bound to account to the company for any secret profits made by them on the sale of property to the company, and that Smith and Russell were acting for the company in making the contract with Blanchard for the purchase of the land, and that the company's money furnished by Elting, Rice, Chamberlin and others was used in the purchase of the property; that Smith and Russell never paid any part of the purchase price, but misrepresented to the company that they had paid $15,000 in cash to Blanchard on account of the contract, when, as a matter of fact, they had paid nothing; and that Elting, Rice and Chamberlin were the real parties in interest at the time the contract was closed, and that the fact that Smith and Russell were obaining a five per cent. commission on the sale of the property was concealed from them and concealed from the company, and that there was no consideration passing to the company for the issuance to Smith and Russell and their nominees of the three thousand shares of no par value stock of complainant company.
The secret profits rule and its application to promoters of corporations is a familiar one and must be considered as firmly imbedded in the jurisprudence of our state. That rule is that a promoter stands in a fiduciary relation to the company which he organizes, and his dealings with the company are subject to the same scrutiny as the dealings between trustee and cestui quetrust generally. The burden is always on the promoter (trustee) to show that his dealings with the company (the cestui) are fair and honest, and that no advantage has been taken by him as a result of the trust relation. *Page 592 
But almost every case requiring the application or interpretation of this rule which is presented to our courts involves principally a question of fact; and "whether or not the company in such case is entitled to claim the benefit of the bargain made by the promoter, is often a question of nicety and may depend upon whether or not the promoter buys the property with his own money or with money that is, in effect, subscribed for the sharecapital." (Italics mine.) Bigelow v. Old Dominion Copper Co.,74 N.J. Eq. 496 (at p. 503).
I take it that the instant case must be governed by the general equity rules relating to this subject, and their application as shown by the following authorities, included in which are the authorities relied upon by counsel on both sides of this controversy: 7 R.C.L. tit. "Corporations" §§ 52 et seq.; 14Corp. Jur. tit. "Corporations" 286 §§ 336 et seq.; Knoop v.Bohmrich, 49 N.J. Eq. 82; 50 N.J. Eq. 485; Plaquemines TropicalFruit Co. v. Buck, 52 N.J. Eq. 219; Woodbury Heights Land Co.
v. Loudenslager, 55 N.J. Eq. 78; on appeal, 56 N.J. Eq. 411;58 N.J. Eq. 556; Hebbard v. S.W.L. C. Co., 55 N.J. Eq. 18;Groel v. United States Electric Co., 70 N.J. Eq. 622; EastonNational Bank v. American Brick Co., 70 N.J. Eq. 722; Arnold
v. Searing, 73 N.J. Eq. 262, and on final hearing, 78 N.J. Eq. 146; Breslin v. Fries-Breslin Co., 70 N.J. Eq. 283; Bigelow v.Old Dominion Copper Co., 74 N.J. Law 496; Tooker v. SugarRefining Co., 80 N.J. Eq. 329; Bliss v. Linden CemeteryAssociation, 83 N.J. Eq. 502; Holcombe v. Trenton White CityCo., 80 N.J. Eq. 154; Piggly Wiggly v. Bartlett, 97 N.J. Eq. 469; Tilden v. Barber (N.J.), 268 Fed. Rep. 599.
Authorities in other jurisdictions considered by me in disposing of this controversy are, in part, as follows: Graham
v. LaCrosse, 102 U.S. 148; 26 L.Ed. 106; Old Dominion CopperCo. v. Bigelow, 203 Mass. 159; 40 L.R.A. (N.S.) 314;89 N.E. Rep. 193; Pittsburg Mining Co. v. Spooner, 74 Wis. 307;Dickerman v. Northern Trust Co., 176 U.S. 181; 44 L.Ed. 423;Old Dominion Copper Co. v. Lewisohn, *Page 593 210 U.S. 206; 52 L.Ed. 1025; Hayward v. Lesson, 176 Mass. 310;57 N.E. Rep. 656; Tompkins v. Sperry-Jones Co., 96 Md. 560;54 Atl. Rep. 254; Yeiser v. U.S. Paper Co., 107 Fed. Rep. 340;52 L.R.A. 724; Banque v. Brown, 34 Fed. Rep. 164; Stewart v. St.L., Ft. S. W.R. Co., 41 Fed. Rep. 736; Ball v. Breed,294 Fed. Rep. 227; Ball v. Chapman, 1 Fed. Rep. (2d ed.) 895;Pietsch v. Milbrath 123 Wis. 647; 68 L.R.A. 945; Corbus v.Alaska Treadwell, c., Co., 187 U.S. 455; 47 L.Ed. 256; LomitaLand Co. v. Robinson, 97 Pac. Rep. (Misc.) 10; 18 L.R.A.
(N.S.) 1106; Yale Gas Stove Co. v. Wilcox (Conn.),25 L.R.A. 90; Van Weel v. Winston, 115 U.S. 228; Mason v.Carrothers (Me.), 74 Atl. Rep. 1030.
Also, the general subject of promoters' profits as treated in14 C.J. 286 §§ 336 et seq.; 7 R.C.L. tit. "Corporations" §§52 et seq.; 25 L.R.A. 90, note; 43 A.L.R. 1364, note; 18 L.R.A.
(N.S.) 1106, note; 2 Cook Corp. ch. 39; 3 Pom. Eq. Jur. (4thed.) § 5.
The prevailing rule applicable to promoters' profits under the circumstances of the instant case is succinctly stated in 14Corp. Jur. 293 § 343, as follows:
"If promoters, contemplating a future issue or sale of stockby the corporation, sell property to the corporation at a gross over-valuation, or otherwise receive a secret profit from the corporation, and stock is subsequently issued to innocentpurchasers or subscribers as contemplated, the corporation itself, or such innocent purchasers or subscribers on its behalf, when they cannot obtain relief through the corporation, may sue to recover such secret profits, or in a proper case to set the transaction aside and for other incidental relief, and it is no defense to such a suit that the promoters at the time of the transaction were the only stockholders, and that the corporation technically consented with full knowledge of all the facts. Therule does not apply, however, to subsequent purchasers of stockfrom the promoters or other stockholders and not from thecorporation. Their remedy, if any, is by individual action, forthe injury is not to the corporation. Nor does the rule apply infavor of subsequent purchasers of stock from the corporationwhere there was no fraudulent concealment of the facts from them,but the transaction was open and free from fraud, and all thefacts were matters of record on the books of the corporation, orwhere the complaining stockholders took their stock with full
knowledge of the facts." (Italics mine.) *Page 594 
One of the leading cases in this country on the subject here involved is Old Dominion Copper Co. v. Bigelow, supra, in which the court said that in order for a promoter to make his contract or dealings with a corporation which he has organized, absolutely binding he must pursue one of four courses:
"(a) He may provide an independent board of officers in no respect directly or indirectly under his control, and make full disclosure to the corporation through them.
(b) He may make a full disclosure of all material facts to each original subscriber of shares in the corporation.
(c) He may procure a ratification of a contract after disclosing its circumstances, by vote of the stockholders of the completely established corporation.
(d) He may be himself the real subscriber of all the shares of the capital stock contemplated as a part of the promotion scheme."
It is evident from a reading of the decisions of our courts on the subject here involved that the doctrine of that case rather than the rule of the United States courts, as announced in OldDominion Copper Co. v. Lewisohn, supra, is favored in this jurisdiction, and there is nothing in our decisions to indicate a disapproval of the Massachusetts doctrine. Arnold v. Searing,78 N.J. Eq. 146, 162. This seems also to be the prevailing rule in other jurisdictions. 14 Corp. Jur. 292 § 342; 7 R.C.L. tit."Corporations" § 53.
There is no pretense here that Smith and Russell followed the course designated as (a). Admittedly, the transaction complained of was carried out by a "dummy" board of directors; but it is insisted that not only one, but all of the three remaining courses were followed.
It cannot be doubted that under our decisions a promoter may purchase property on his own account for any price he can, with the intention of selling it at a higher price to a company formed or to be formed and sell it to that company at a profit, so long as he does so fairly. Plaquemines Tropical Fruit Co. v. Buck,supra. And that under such circumstances no rule of law or equity prohibits such profits. Bigelow v. Old Dominion CopperCo., 74 N.J. Eq. 496 (at p. 501). *Page 595 
It will be noted that there is a distinction between the rights of a corporation to recover secret profits from its promoters and the individual right of action of stockholders for damages by reason of misrepresentation or deceit of the promoter in selling the stock. 7 R.C.L. tit. "Corporations" § 54; 14 Corp. Jur.293 § 343; Old Dominion Copper Co. v. Bigelow, supra;Pietsch v. Milbrath, supra.
The general rule is stated in 7 R.C.L. 77, as follows:
"If the promoters are the subscribers to all the capital stock, or all the stock has been taken and the holders thereof assent to the transaction between the promoters and the corporation, then if a person acquiring stock otherwise than at first hand is deceived into doing so by fraudulent representations that the full amount of the share capital has been paid into the corporation, and that all the stock was taken on a common basis, his right of action for damages is personal, not for enforcement of the rights of the corporation."
And see Mason v. Carrothers, supra, where many authorities on this point are reviewed by the court. See, also, Arnold v.Searing, 73 N.J. Eq. 262.
I do not understand Vice-Chancellor Howell to have held contrary to this rule when Arnold v. Searing was before him on final hearing. 78 N.J. Eq. 146. It was found in that case that there was not a complete disclosure of the secret profit and that the real parties in interest, the syndicate members, did not assent to the transaction, and, of course, under those circumstances the rule of individual liability did not apply.
It is also held that where stock is accepted as a bonus or mere gratuity on the sale of bonds or other securities of the corporation, the person receiving such bonus or gratuity is estopped to deny the validity of the stock and that so, also, is the corporation (Arnold v. Searing, Knoop v. Bohmrich,Breslin v. Fries-Breslin Co., supra), and that whatever will estop a stockholder from the enforcement of his claim will also estop the corporation. Breslin v. Fries-Breslin Co., supra; 4Thomp. Corp. § 5269.
In considering the right of a corporation or stockholder to attack a transaction between a promoter and a corporation organized by him, it is important to consider the plan of *Page 596 
financing and whether or not that plan contemplates the sale of stock to the public in order to provide capital for the corporation. If it does, then, ordinarily, the promoter is held liable to account to the corporation for his profit, and this is so even where all of the stock of the corporation is issued to the promoter in return for property transferred to the corporation by him, if he has in advance sold any portion of that stock to the public, because in such case the purchaser is then one of the real parties in interest at the time of the transaction, and without his consent the transaction will not be permitted to stand. Arnold v. Searing, supra. Such a purchaser is considered an original subscriber to stock notwithstanding the fact that the stock is in the first instance issued to the promoter; but where there is no intention ofselling stock to the public and the whole authorized issue of stock of the corporation is turned over to the promoter in payment for the property transferred to the company by him, no one can complain. 2 Cook Corp. 1887 § 651. True, he is on both sides of the transaction, but he, as the owner of all of the stock of the company, is, in effect, the corporation itself. His knowledge is that of the corporation.
The exemption of the promoter from liability to the corporation for a sale without disclosure, when he takes the entire issue of capital stock, is an exception to the general rule imposing upon him the liabilities of a trustee." Old Dominion Copper Co. v.Bigelow, supra.
The real reason for this exception "is that the corporation is estopped by the circumstance that all persons with financial concern in the matter have assented with knowledge, and thus the lips of everybody are sealed. It is not that no wrong has been done, but that whatever wrong has been done has been condoned."Ibid.
If, subsequently, stock is sold to the public direct from the company, a right to attack the transaction then arises.
But it is important to bear in mind that the right to attack a transaction between a promoter and a corporation extends only to those who contribute to the "share capital," in any event. That is, to those who purchase stock and by such purchase supply capital to the company. The test is whether *Page 597 
the property was bought with moneys of the company arising from a sale of this "share capital." The right does not extend to creditors. Banque Franco-Egyptienne v. Brown,34 Fed. Rep. 162; Van Weel v. Winston, 115 U.S. 228; 2 Cook Corp. 1895 §§735, 742, 743. Creditors, as such, have no voice in the management of the affairs of the corporation.
Although the English courts have, apparently, applied the promoters' profits rule more strictly than the courts generally in this country, it has been held there that the trust relation of the promoter toward the corporation does not extend so as to operate in favor of bondholders. Cornell v. Hay 8 L.R.C.P.328; 42 L.J.C.P. 136; 28 L.T. (N.S.) 475; 21 Weekly Reports580.
This doctrine should not be extended except in so far as is necessary to prevent fraud and deceit; never to the extent of restraining or prohibiting the promoter from enjoying his legitimate profit or reaping the honest reward of his labor. To do so would be to make this court an instrument of fraud rather than a corrector of wrong. Much of a condemnatory character and in excoriation of the promoter has been written in judicial opinion, but little in his commendation. This whole doctrine is "judge-made law," and not the creature of statute. Chancellor Pitney, in Bigelow v. Old Dominion Copper Co., supra (at p.506). But that the promoter has his place in society and his usefulness in the world of business is beyond question. He is usually a man of vision, and his visions are not always dispelled by the sunlight of experience. Without him much of the material success and industrial progress of this country would not have been attained and scientific advancement would perhaps have been retarded. He, as well as the corporation which he organizes, or its stockholders, has his rights and is as much entitled to the protection of this court as are those who seek to share in the fruits of his labor. As this promoters' profit doctrine is "judge-made law," and as state policy is indicated by the action of the legislature and not by the courts (Bigelow v. OldDominion Copper Co., supra), it cannot be said that there is anything in the public policy of this state requiring a different application of equitable principles to promoters than *Page 598 
to other litigants. As an indication of public policy, if one were needed, it is well to bear in mind the enactment by the legislature in 1903 of an act, sweeping in its provisions with respect to promoters' profits (P.L. 1903 p. 362), and its subsequent repeal by the legislature in 1907. P.L. 1907 p. 361.
Even later acts, notably the repeal of the "Seven Sisters" laws, might be cited in this connection. The repeal of a law is as indicative of public policy as is its enactment.
Four main questions are raised in this suit, as follows:
1. Are the defendants Sidney S. Smith and the Russell estate accountable to the complainant for the profit of $10,000 received by them in the form of bonds of the complainant corporation and the three thousand shares of the no par value stock issued to them on the assignment of the Blanchard contract?
2. The validity of the sales contract between complainant and Smith and Russell, whereby they were appointed sole sales agents for the company's property.
3. The validity of the contracts for the sale of lots to the defendant Paul S. Smith.
4. The validity of the issue of the fifty shares of stock to the defendant Chapot.
I shall consider the above questions in the order of their statement.
"The circumstances of each case must determine the jurisdiction of the court of equity to give the relief sought." Corbus v.Alaska Treadmill Gold Mining Co., 187 U.S. 455; 47 L.Ed. 256.
And in considering the issues here involved, certain negative propositions should be borne in mind. The rights of creditors, as such, are not in controversy; the complainant company is perfectly solvent and is not in the hands of a receiver; the question of assessment against stockholders for unpaid subscriptions to provide funds for the payment of debts is not
involved. It is not alleged that the property sold to the company by Smith and Russell was worth less than the company paid for it. The plan of financing the company did not include the sale of any of its stock to the public and no part of the capital stock, with the exception of the fifty shares held by the defendant Carrie Chapot, was ever sold *Page 599 
to the public. These fifty shares were purchased by this defendant from Smith and Russell long after the transactions complained of and not as a part of the financing plan of the company. The company was completely financed by loans made to it on the security of its debenture bonds.
 I.
The first question is, of course, the most important and the most complicated of the four. It requires a minute analysis of all the facts here presented, and its solution will depend, as I view it, upon whether or not Smith and Russell have brought themselves within one of the four conditions above suggested as justifying the retention by them of their profits.
The defense to the bill on this phase of the case is (1) that Smith and Russell were the only stockholders and the real parties in interest at the time of the assignment of the contract, and the only persons who had a right to complain, and that their acquiescence in the transaction binds the company and all persons who acquired any interest as a stockholder by assignment from Smith and Russell; (2) that there was a full and complete disclosure of all the facts and circumstances surrounding the transaction to all parties in interest, and (3) that the stockholders themselves, after the membership in the corporation was complete, ratified and approved of the whole transaction.
(1) In my judgment the answer to this question must depend largely upon the consideration of the exact relation which Rice, Elting, Chamberlin and Mitchell bore to the corporation prior to the sale and assignment by Smith and Russell of their contract with Blanchard to the complainant. While they and others interested in the complainant company have taken the position that they were stockholders, either actually or potentially, prior to the sale and assignment of this contract, the fact is that none of them ever became a stockholder in the corporation until after the transactions complained of were completed and then only as a result of their receiving bonus stock as a gift from Smith and Russell individually. For the purpose of disposing of the claims of *Page 600 
these four stockholders, which, in effect, will dispose of the claim of the corporation on this branch of the case, I will discuss them in the order of their investments.
The first investment was made by Elting on April 8th, 1925, when he agreed with Russell to purchase the company's six per cent. debenture bonds to the amount of the par value of $5,000 and gave Russell a check for $500 on account of such purchase. He did not purchase or subscribe to any stock in the corporation. He himself testified that he knew nothing about any stock bonus; that he bought bonds and received what he paid for; that, in fact, he received a stock bonus on the same basis as all other bond purchasers, but he knew nothing about such bonus until the stock certificate was delivered to him. Obviously, Elting was nothing more nor less than a creditor of the complainant corporation, he having agreed to loan the company $5,000 on its unsecured six per cent. debenture bonds and having advanced $500 on account of that loan. He was actually in no better position than if he had loaned the company on its promissory note. Elting was not an original subscriber to a part of the "share capital."
Rice was in exactly the same position as Elting, except for the fact that there was an agreement by Smith and Russell to give him a stock bonus. The subscription agreement dated April 14th, and Rice's check drawn to the order of the corporation (which, by the way, was never used), must, of course, be considered in connection with his own testimony. He says that when he agreed to take the bonds Russell agreed to give him certain of the capital stock as a bonus; that he understood this stock was to be issued direct from the company, and that he did not understand it was to be given him by Smith and Russell; but as to this latter claim the weight of the evidence is to the contrary, and the fact that it was bonus stock was enough to put him on notice, as he must be presumed to know the law and that the corporation could not legally issue bonus stock. Bliss v. Linden CemeteryAssociation, supra. Rice was, therefore, at the time of the transaction complained of, merely a creditor of the company who had been induced to become such by the promise of a gift of bonus stock. In his capacity of creditor *Page 601 
of the corporation he had no standing as an objector to the transaction between the company and Smith and Russell. As to Chamberlin and Mitchell, it very clearly appears that they were not even approached by anyone with respect to investment in this company until after the transaction complained of had been closed. None of the other stockholders claim to have any rights antedating those of the four stockholders just mentioned except Wallace H. Blanchard; but he made no investment whatever in the company, and all the stock of the company which he holds came to him as a gift from Smith and Russell, and without his having paid a cent to anybody therefor. W. Benton Russell and Mr. Suderly, the attorney, who acted as "dummy" incorporators and directors, do not claim to have had any interest whatever in the corporation either then or since. These facts, therefore, make it plain, to my mind, that Russell and Smith were the only original and real subscribers of all the shares of the capital stock of the complainant company at the time of the organization, and that they alone were to be considered and consulted with respect to the sale by them to the company of the contract which they had with Blanchard for the purchase of his lands, and that their first ground of defense is sustained. This brings them within the fourth condition of the Bigelow Case mentioned above.
(2) But assuming for the sake of argument that Smith and Russell were not the only parties in interest and the only persons whose consent to the transaction was required, I think the evidence convincingly demonstrates that there was a full and complete disclosure of all the essential facts and circumstances surrounding the transaction to all parties who were entitled to such disclosure.
Of course, Elting was not a subscriber to stock in any sense of the word. His own testimony is to this effect. He was merely a creditor. As such he had no right to a full disclosure.
So far as Rice is concerned, we may assume for the purpose of disposing of this question that he was both a creditor and a stockholder, or, as it is generally expressed, an original subscriber to stock of the corporation. His right as a creditor *Page 602 
to challenge this transaction has already been disposed of by what has been said of Elting under this head. If he is also to be considered as an original stockholder, I think the evidence clearly shows that there was a complete disclosure to him of every pertinent fact, knowledge of which he was entitled to have. He attended the adjourned meeting of the board of directors on April 29th, 1925, at which time he was elected a director, and took part in its proceedings. There was no concealment at this meeting of what had transpired at the stockholders' and directors' meetings on the previous day. The meeting which he attended was merely a continuation of the directors' meeting of the preceding day. The minutes of both the stockholders' and directors' meetings, which had been prepared by the attorney a long time before, were on the table before the directors, and they were, according to the testimony of some of the witnesses, read and explained to Rice. This he denies, but in my judgment the weight of the evidence on this point is against him. But certainly he had the opportunity to read those minutes even if he did not do so. Rice also says that he knew nothing about the sales agreement between the company and Smith and Russell, or that Smith and Russell were the owners of any bonds or stock which they had received in consideration of the assignment of their contract to the company. But if he did not know, he has no one to thank for his ignorance except himself. Certainly there was no concealment of the facts from him, and alleged concealment and secrecy in the transaction amounting to fraud are the basis of this action. But I must consider his testimony in the light of what occurred as disclosed by the minutes of the directors' meeting of April 29th. Those minutes show a resolution authorizing the execution of a purchase-money mortgage to Blanchard and reciting the assignment of the contract of sale from Smith and Russell to the company. Rice voted in favor of the adoption of this resolution, according to the minutes. I must assume that he knew what he was doing. There is no evidence to the contrary. The fact that there had been an assignment of the contract for the purchase of Blanchard's lands to the company was certainly then brought to the attention *Page 603 
of Rice with sufficient force and clarity to have put him on inquiry as to why the contract with Blanchard was made with Smith and Russell, and why they were assigning the contract to the company instead of the company making the contract direct with Blanchard; and whatever put Rice on inquiry is sufficient notice in the law. As a matter of fact, Rice probably knew that the purpose of assigning the contract to the company was to accomplish the lawful issue of the no par value stock so that Smith and Russell might use some of it as bonus stock in financing the company. Rice's testimony as to his ignorance of the methods by which Smith and Russell acquired their bonds must be considered in the light of the disclosures by this resolution at this meeting, and the fact, also, that for two years afterwards Rice sat in practically every stockholders' and directors' meeting without raising any question whatever as to the stock or bond interests of Smith and Russell or how they obtained them. He admits that he knew at the time of his first subscription for bonds that he was to get stock as a bonus, and he must be presumed to have known that the corporation could not under the law issue bonus stock direct to him. He must have known that somebody would have to pay the corporation for the stock which was to be issued to him. By this knowledge alone he was put on inquiry. The real fact is that Rice did not care how or when this stock was issued, or who paid the corporation for it, so long as he got it for nothing. That he was getting "something for nothing" was the all-important and controlling influence.
If Rice did not know all the facts after sitting in the directors' meeting of April 29th, 1925, then he must confess to less intelligence then he appears to have. But, notwithstanding his knowledge of the facts, which must be assumed from his opportunity, he subscribed for another $5,000 par value of bonds at this meeting.
Rice says that it was understood when he put up the first $5,000 in cash that Smith and Russell had also put up an equal amount, and that they three were to share equally in the transaction, and that there was not an equal division of profits among these three seems now to be the real complaint *Page 604 
of Mr. Rice; but if there was any such agreement, that was a personal agreement for which he has his individual right of action. Arnold v. Searing, supra. It seems unlikely, however, that any such agreement existed. Mr. Rice testifies that all his arrangements and dealings in connection with this company up to the time he purchased the company's bonds and became a director of the company were with Mr. Russell, and that Russell kept every agreement which he ever made with him. Rice's contention of a promise that he would share equally in this organization with Smith and Russell, and his statement that Russell kept every agreement and performed every promise which he ever made with him, cannot both be correct. They are totally inconsistent.
If Rice knew that Smith and Russell were making a profit, and it seems reasonable to suppose that he did, "the mere fact that he did not know the amount will not entitle him to complain, in the absence of some misrepresentation in the matter." LomitaLand Co. v. Robinson (Cal.), 97 Pac. Rep. 10; 18 L.R.A.
(N.S.) 1106.
Now, to whom else was there any duty on the part of Smith and Russell to make a full and complete disclosure of all of the transactions with respect to the sale and assignment of this contract? Certainly not to Chamberlin, Mitchell or anyone acquiring an interest subsequent to them. They had not even been approached with respect to this organization until after the transaction was completed and after all the stock of the complainant corporation had been turned over to Smith and Russell. The only others whose rights are to be considered, therefore, are Smith and Russell themselves, Russell's son, W. Benton Russell, Wallace H. Blanchard and Suderly, the attorney. Of course, Smith and Russell knew all about the transaction. It was their deal. They did not have to make any disclosure to themselves and no disclosure was necessary so far as Wallace Blanchard was concerned, because he had full and complete knowledge. It was he who made the arrangements for Smith and Russell with his father, and through his efforts that his father consented to credit the commission of $10,000 on the initial cash payment. He agreed with Smith and Russell to induce his *Page 605 
father to consent to this arrangement from two motives — first, to help his father make the sale, and second, in the hope of some reward from Smith and Russell. They had suggested to him that they would take care of him with some stock. He himself says it was not definitely known how much of the stock they could retain or how much they were to give him. He knew they were to get the stock for the contract, but he had no financial interest in the company at the date of the organization, and therefore did not care how much stock they got. He then only hoped that after the organization was complete they would give him something; how much he had no idea, and he would have been perfectly satisfied with anything they chose to give him. At the time of the organization he was a mere "dummy," acting for Smith and Russell, and knew it. But he was not so much of a dummy that he did not appreciate what he was doing. Whatever he did he did for Smith and Russell, and it was just the same as though they had done it themselves.
Suderly, the attorney, knew all of the details, helped plan them and acted as a "dummy" incorporator and director for Smith and Russell. He had no real interest. He is therefore in the same class with Wallace Blanchard so far as his right to a full disclosure is concerned.
W. Benton Russell did what his father told him to do, and for no other reason. He had no interest in the affair except that of a son's interest in carrying out the wishes of his father. That he understood what he was doing I have no doubt, but whether he did or not is immaterial. His acts were those of his father, and he now presents a sorry spectacle in attempting to hide behind a pretended ignorance in the hope that those behind this suit will be lenient with those interested in his father's estate, of whom he is one. He is willing, Judas-like, to betray his father's friend and associate for a few pieces of silver.
It is a significant fact that in the trial of this cause there has been an apparent effort to shield Mr. Russell and his estate, and to concentrate on fixing liability on Sidney S. Smith alone. It was even suggested in open court by counsel for the Russell defendants that there was a tentative arrangement *Page 606 
to the effect that the Russell defendants should not suffer as the result of this suit; and so sure of his position has he seemed to be that he took very little part in the actual trial of the cause and has not taken the trouble to file any brief, although it is quite apparent that the liability of Smith and Russell, if any, is a joint and several one. Every complaining stockholder who has testified has said that Russell kept all his promises and that he always did what he said he would do.
It was long ago held in Arnold v. Searing, supra, that neither the corporation nor a shareholder in its behalf can complain of a fraudulent transaction to which all the stockholders acceded with full knowledge of the facts. This rule applies in all its force to the complainant company and to Rice, Suderly, Wallace Blanchard, W. Benton Russell and all others who had any financial interest whatever up to the date of the meetings on April 28th and 29th. In that case it was held that a subsequent transferee of shares of a corporation who was deceived by false representations touching the capitalization of the company sustains an injury purely personal to himself and not to the collective rights of the stockholders. If, therefore, Chamberlain, Mitchell or any of the other stockholders who acquired their stock subsequent to April 28th, 1925, have any right of action at all, it is a personal right of action against the defendants Sidney S. Smith and the estate of George E. Russell; and their liability, if any, is a joint and several one.7 R.C.L. tit. "Corporations" § 56.
(3) In view of my conclusions on (1) and (2), as already expressed, it would be idle to discuss the question of ratification, and I therefore express no opinion on that point.
It is not claimed by the defendants that Smith and Russell provided an independent board of directors for the complainant company which acted independently in the purchase of the contract or in the other transactions recorded in the organization meeting.
While an analysis of some of the New Jersey decisions on the subject of promoters' secret profits might seem appropriate *Page 607 
at this time for purposes of comparison, no adequate discussion of them could be had within the proper limits of this opinion, already overlong, and I shall therefore content myself with saying that I have carefully read and considered every reported New Jersey case dealing with this subject and found no decision, or rules of law or equity therein expressed, as I understand them, inconsistent with my conclusions here. Every case in which the promoter has been held accountable to the company for his profit is easily distinguishable from the one now before the court. These cases nearly all involve a question of assessment for unpaid stock subscriptions for the benefit of creditors, or the right to recovery of the secret profit is clear because of the trust relation, or because the plan of financing included the sale of stock to the public and the company was actually financed by such sale. But the trust relation must be established before the rights and liabilities incident thereto arise; and a right, to be enforced, must be first shown to exist.
It is true that subsequent takers of bonus stock which has not been fully paid for are held to be "original subscribers" in the sense that they are liable to assessment for the benefit of creditors in the event of insolvency. But they are not "original subscribers" in the sense that they have a right to challenge thebona fides of a transaction already approved by their transferrors. The same reason lies back of both of these propositions, viz.: They have taken the stock with notice of its infirmities and subject to all equities and disabilities. One of these disabilities is that the holder cannot complain of fraud in its issue and no right through it inures to the company to attack as fraudulent a sale to the company by such transferror.
The complainant challenges the consideration passing from Smith and Russell to the corporation for the bonds and stock issued and demands that the bonds be returned and the stock surrendered and canceled because void for lack of consideration.
With respect to the bonds, the right of Smith and Russell to retain them depends upon their right to sell the Blanchard *Page 608 
contract to the company at a profit, and this has already been disposed of. Whatever profit Smith and Russell made on this deal was not a secret profit. It seems plain that they had at least a $10,000 equity in the property at the time the contract was assigned. What they actually did was to buy the property from Blanchard for $190,000 and sell it to the company for $200,000 plus three thousand shares of no par value stock. There is no claim that the property turned over to the corporation was worth less than the price which the company was required to pay for it, and even if there were such a claim there is no evidence to support it. This was not a sale from Blanchard to the company on which Smith and Russell were collecting a commission. It was in the first instance a purchase from Blanchard by Smith and Russell on which they were made an allowance on account of the purchase price to the extent of the commissions to which they would have been entitled if the property had been sold to a third party. There was nothing illegal in this transaction, but even if it were considered as a sale direct from Blanchard to the company and on which Smith and Russell were receiving a commission, the company cannot complain because of its assent and approval as already indicated. The question respecting the remaining $5,000 in bonds delivered to Smith and Russell by the company and which were by them delivered to Rice will be referred to later.
It is obvious that if the stock issued to Smith and Russell is void, then so, also, is that now held by all the stockholders, with the possible exception of the defendant Chapot, as they all obtained it with notice that it was bonus stock, and they cannot be considered as bona fide purchasers for value. But they do not suggest that their own stock should be surrendered or canceled; on the contrary, they are asking in this suit some benefit from the very stock which they claim to be void. Obviously, it is only as stockholders, and not as creditors, that they can benefit from the company's success in this suit. In considering this question of lack of consideration it must be borne in mind that the stock here involved is without par value. Cases involving the issue of stock with par value in *Page 609 
payment of property and the giving of such stock as a bonus are not, therefore, controlling. Assuming that the property involved was worth only $200,000, and there is no proof that it was not worth more, still, it would not follow that the stock was issued without consideration. There were certain rights in the Blanchard contract itself which were of some value to Smith and Russell over and above their $10,000 interest, and they would be entitled to some compensation for their services in organizing the complainant company. Bigelow v. Old Dominion Copper Co.
(N.J.), supra; Holcombe v. Trenton White City Company,supra. The stock itself having neither par nor real value at the time of this transaction, the action of the directors in fixing a value of one dollar per share could not give it that actual value any more than by a mere declaratory resolution they could create value in property purchased. The actual value of the three thousand shares of stock at the time it was authorized to be issued to Smith and Russell may have been infinitesimal. Its future value was problematical, depending in large measure on the efforts of Smith and Russell themselves. If the property and rights turned over to the corporation in payment of this stock were in the instant case not worth in excess of $200,000, then the stock itself in the hands of Smith and Russell was valueless, as the stock merely represented the value of their interest over and above that sum in the contract sold. If the equity was worth nothing, then neither was the stock. If the stock was valueless, then Smith and Russell got nothing by it. It is obvious that the value of the stock and the value of Smith and Russell's equity in the contract must equal each other, and so considered there is a valid and adequate consideration for the issuance of the stock. But, assuming that they had no equity in the contract, yet their services in organizing the company were of some value and they were entitled to compensation for their services. If the stock were considered as having been issued in payment for services, and this court has a right to so view it when its validity is challenged as here, the stock cannot be successfully attacked, as the value of the services and the *Page 610 
value of the stock must in such case equal each other. Each share of stock would represent a one one three-thousandth part of the equity or the value of the services, as the case might be.Bliss v. Linden Cemetery Association, supra. In the case cited the "land purchase shares," which had no par value, were held invalid as unauthorized by statute. But shares without par value are now fully authorized by law and may be issued for "such consideration as may be prescribed in the certificate of incorporation (Cum. Supp. Comp. Stat. p. 687 §§ 47, 119 E); and that document authorized its issue "for such consideration as should be fixed by the directors." In authorizing its issue for an assignment of Smith and Russell's contract the directors, in effect, fixed the consideration. The subsequent fixing of a value of one dollar per share for the stock was meaningless and ineffective. The corporation then had no stock to sell and contemplated having none.
The latest New Jersey case on the question of promoters' secret profits and the only reported case in this state dealing with stock without par value in connection with a claim for secret profits which I have been able to find is Piggly Wiggly.Delaware v. Bartlett, supra. In that case Bartlett had secured a license from the originator of the Piggly Wiggly system, and had paid therefore $1,000. This license he subsequently turned over to the complainant company through the medium of a dummy board of directors and caused all of the no par value capital stock of the company to be issued to him in payment therefor. Subsequently, preferred and common stock of the company was sold to the general public and the whole selling price of such stock, both common and preferred, was paid to the company, and after deducting from that price the value of the preferred stock sold, the balance, less expenses, was turned over to Bartlett, as representing the proceeds of the common no par value stock. The company sought to recover from Bartlett the moneys appropriated by him representing the proceeds of the sale of the common stock, and the bill was dismissed. The language of Vice-Chancellor Ingersoll in that case is pertinent here. He said: *Page 611 
"No person other than the three incorporators had any interest in this corporation or its stock or assets until the first sale of stock to others, which took place after the events before set out."
The events before set out were the events leading up to the incorporation of the company and the sale of the license by Bartlett to the company in consideration of the no par value stock, but in the instant case there was no sale of stock at all either before or after the events complained of. Every single stockholder except Smith and Russell and Carrie Chapot received his or her stock as a bonus, a mere gift, and paid nothing for it.
There is one phase of this controversy not dealt with in the original briefs submitted by counsel, but of sufficient importance, to my mind, to require consideration both by court and counsel in connection with the $5,000 advanced by Rice and paid by Smith and Russell to Blanchard on the execution of the contract of sale. This phase involves the question of a resulting trust in the Blanchard contract in favor of the complainant. At my suggestion supplemental briefs on this point were submitted by counsel. It was argued by counsel for the defendants that this $5,000 represented a loan from Rice to Russell, but there is no evidence to support such a claim. Beyond a doubt the $500 advanced by Elting and the $5,000 advanced by Rice was the company's money. It represented loans to the company from these two individuals. The $500 was apparently accounted for to the company by Russell. The $5,000 advanced by Rice was paid to Blanchard. It was therefore the company's money which made up one-third of the down payment on the contract at the time of its execution, and under familiar equitable principles a resulting trust to the extent of the corporate funds advanced would arise in favor of the corporation. Bergstrasser v. Sayer, 42 N.J. Eq. 488; Cutler v. Tuttle, 19 N.J. Eq. 549; Wheeler v.Kirtland, 23 N.J. Eq. 13; Baker v. Baker, 75 N.J. Eq. 305;Stratton v. Dialogue, 16 N.J. Eq. 70.
But if corporate funds constitute only a part of the consideration a trust would arise pro tanto only. In this case it *Page 612 
may be conceded for the purposes of this case that when the Blanchard contract was taken by Smith and Russell in their own names it was taken subject to a trust in favor of the corporation to the extent of $5,000. But whatever claim or interest the company had under the resulting trust was extinguished by a merger of that interest with the interest acquired upon the assignment of the contract of sale. The acceptance of such assignment by the company terminated the trust relation and constituted a waiver of all further claims arising out of the transaction. This is so because assented to by the company and all its stockholders. If Smith and Russell were trustees under a resulting trust they were trustees for the corporation but not for its creditors. The $5,000 may have been a trust fund as between the corporation and Smith and Russell, but it was not as between Rice and the company. For this $5,000 the corporation was obliged to deliver to Rice its bonds in an equal amount, and this it did using Smith and Russell merely as a conduit. Rice got what he bargained for and so did the company. The situation would have been no different if Smith and Russell had taken the contract in the name of the company and the company had paid this $5,000 to Blanchard. Under such circumstances the transaction could not have been successfully attacked because consented to by all the remaining parties in interest. Both the company and its stockholders are now estopped to deny the validity of the transaction.
"It is not that no wrong has been done, but that whatever has been done has been condoned." Old Dominion Copper Co. v.Bigelow, supra.
 II.
As to the validity of the sales agreement between complainant and Smith and Russell, it will be recalled that under this agreement Smith and Russell were appointed sole sales agents of property of the complainant company for a period of five years, and that they were entitled to a commission of ten per cent. on sales of the company's lots. In consideration of this appointment Smith and Russell agreed to sell *Page 613 
and dispose of such of the company's bonds, not exceeding in the aggregate $100,000, as might be necessary for the company's needs, and also if and when necessary to give stock of the company owned by them at the rate of one share for each $100 of bonds as a bonus to purchasers of said bonds. The evidence discloses that Smith and Russell have sold debenture bonds of the company to the amount of $83,000, and have given away of their stock whatever was necessary and substantially in the proportion above mentioned. They sold all of the bonds which the company required them to sell. They have also sold eight lots of the company for a consideration of $18,000. The sale of the lots has been somewhat restricted and hampered because the company was not prepared to put them on the market until improvements contemplated pursuant to their plan of development had been completed. It will thus be seen that the company has accepted, during a period of about two years, the benefit of this contract. That Smith and Russell had such a contract was apparently known to everybody interested in the company, as all stockholders who testified agreed that each and every one of them had the privilege of selling lots of the company and in the event of such sales by them they were entitled to a five per cent. commission out of the commission provided to be paid to Smith and Russell under this contract. It seems to me, therefore, that irrespective of the original status of this contract it has now been ratified by the company by accepting substantial performance on the part of Smith and Russell, and by its recognition by the board of directors as a valid and subsisting contract during the period since the incorporation of the complainant company. The company cannot now complain.
 III.
As to the Paul Smith contracts for the purchase of lots, they are attacked on the ground that they were altered after execution and because of alleged forfeiture. The contracts as originally drawn provided that the purchaser should begin the construction of a building on the lots within sixty days, *Page 614 
and provided a definite date for settlement. The contracts themselves show plainly that the word "sixty" was erased and the word "ninety" substituted therefor. The charge is that this erasure was made either by or at the direction of the defendant Sidney S. Smith after the contracts were executed and without the knowledge or authority of the directors or officers of the company. Both the defendants Sidney S. Smith and Paul Smith deny this, and Chamberlin, who is now president of the company, asserts the truth of the charge. The only disinterested witness testifying on this point, however, was Miss Graffoel, who was the former stenographer in Mr. Smith's office, but who is not now employed by any of the parties interested in this suit. She corroborated the testimony of the Smiths with respect to the alterations in these contracts. She testified that the contracts were altered by her at Smith's direction in Chamberlin's presence. This is the testimony of the father and son also.
The weight of the evidence, therefore, is against the contention that the alterations were either surreptitiously made or unauthorized. As to the claim of forfeiture under the contracts because of the alleged failure of the purchaser to begin the building within the time limited, the witness Farrell, the architect employed by the defendant Paul Smith to supervise the construction of his building, testified that the foundation on the Smith lots was laid out by him on April 17th, 1926, and the cellar excavation completed on April 30th, 1926, which was well within the time limit. He testified from his time cards. He was a disinterested witness and his testimony was corroborated by his own records made in the course of his business. I think it must be accepted as a fact that there was no forfeiture. As to the bonds held by Paul Smith and for which a money decree is sought, they have been fully paid for and nothing is due the company on their account.
 IV.
With respect to the fifty shares of stock issued to Carrie Chapot, the charge is that it was issued fraudulently and *Page 615 
without consideration, and the prayer is for the surrender and cancellation of such stock. The evidence showed that Smith and Russell purchased some lands from this defendant and in part payment of same transferred to her these fifty shares of stock which had been originally issued to them. It thus appears that this defendant is about the only bona fide purchaser of stock for value, outside of Smith and Russell themselves. All of the other stockholders obtained their stock as a bonus, as a gift, a mere gratuity, which in itself was notice to them of its character, and if invalid for any reason they are estopped to deny it. The defendant Carrie Chapot is not so bound. The stock in her hands, as between her and the corporation, is valid.
I will advise a decree dismissing the bill of complaint, with costs.